SHAW v CITY OF ECORSE

Docket Nos. 279997 and 280693. Submitted March 11, 2009, at Detroit.
Decided March 19, 2009, at 9:00 a.m.

Robert Shaw brought an action in the Wayne Circuit Court against
the city of Ecorse, alleging age discrimination and breach of
contract as a result of his removal from employment as the chief of
police. John Bedo, after being added as a coplaintiff, brought a
claim under the Whistleblowers' Protection Act (WPA), MCL
15.361 *et seq.*, alleging that he was demoted from the rank of
captain in the fire department and faced other disciplinary actions
after he testified under subpoena on behalf of a former fire chief
who brought an action against the defendant for racial discrimi-
nation and breach of contract. The court, Gershwin A. Drain, J.,
granted summary disposition in favor of the defendant regarding
Bedo's claim. A jury returned a verdict in favor of Shaw, and the
court, after denying the defendant's motion for a new trial or
remittitur, entered a judgment for Shaw. Both Bedo and the
defendant appealed, and their appeals were consolidated.

The Court of Appeals *held*:

1. The trial court erred in granting the defendant's motion for
summary disposition of Bedo's WPA claim. The trial court erred in
determining that Bedo was not engaged in activity protected under
the WPA when he testified under subpoena at a court proceeding.
Neither MCL 15.362 nor the interpretation of that statute in
*Henry v Detroit*, 234 Mich App 405 (1999), requires a type 2
whistleblower (e.g., an employee who is requested by a public body
to participate in a court action) to report or testify regarding a
violation or suspected violation of a law, regulation, or rule in order
to be protected by the WPA. A material question of fact exists
regarding whether there is a causal connection between the
protected activity and the adverse employment action and, there-
fore, summary disposition was erroneously granted in favor of the
defendant. That order must be reversed and the case involving
Bedo must be remanded for further proceedings.

2. The evidence supports the amount of the jury's award of
noneconomic damages in favor of Shaw. The trial court did not err
by denying the motion for remittitur with regard to the award.

3. The jury's interpretation of the relevant contract language was reasonable in light of the evidence presented by Shaw. Remittitur of the jury's award of pension benefits to Shaw was not warranted.

4. The testimonies of two individuals who sought employment as the deputy chief of police and that indicated that their age was a determining factor in the decision to not employ them was not unfairly prejudicial or misleading. The trial court did not abuse its discretion by admitting the testimony.

Order granting summary disposition of Bedo's claim in favor of the defendant reversed and case remanded for further proceedings; order granting judgment in favor of Shaw and denying motion for a new trial or remittitur affirmed.

MASTER AND SERVANT — WHISTLEBLOWERS' PROTECTION ACT.

The Whistleblowers' Protection Act provides protection for two types of whistleblowers, first, those who report, or are about to report, violations of a law, regulation, or rule of a public body, and, second, those who are requested by a public body to participate in an investigation held by that public body or in a court action; the second type of whistleblower is not required to report or testify regarding a violation or suspected violation of a law, regulation, or rule in order to be protected by the provisions of the act (MCL 15.362).

*Amos E. Williams* and *Thomas E. Kuhn* for the plaintiffs.

*Cummings, McClorey, Davis & Acho, PLC* (by *Ethan Vinson* and *Joseph Nimako*), for the defendant.

Before: DONOFRIO, P.J., and K. F. KELLY and BECKERING, JJ.

PER CURIAM. These consolidated appeals arise out of plaintiffs' claims of adverse employment actions. In Docket No. 279997, plaintiff John Bedo appeals by leave granted the trial court order granting defendant, city of Ecorse, summary disposition with regard to his claim under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.* In Docket No. 280693, defendant appeals as of right the jury verdict in favor of plaintiff Robert

Shaw on his claims of age discrimination and breach of contract and the trial court's order denying its motion for a new trial or remittitur. In Docket No. 279997, we reverse and remand for further proceedings. In Docket No. 280693, we affirm.

## I. FACTUAL BACKGROUND

### A. FACTS IN DOCKET NO. 279997

Bedo worked for the city of Ecorse Fire Department from 1973 to 2006. In the 1990s, he was promoted to fire captain, and in 2003 and 2004 he temporarily served as fire chief. In mid-2004, he returned to his position as fire captain. On June 9, 2006, Fire Chief Ronald French issued a command reducing the number of firefighters required to be on duty. Later that day, Bedo objected to the command in a department report, stating, "Per your Directive dated 6/9/06, I believe both Mayor Salisbury and Interim Chief French [have] jeopardized our Citizens' and Firefighters' safety. In the event of either the Citizens', Firefighters', or my injury or death, caused by these actions, I will hold you both responsible."

On June 13, 2006, Bedo testified in a case initiated by former Fire Chief Ronald Lammers against defendant in which racial discrimination and breach of contract were alleged. Both Bedo and Fire Captain Arthur Andring were subpoenaed to testify on behalf of Lammers. On June 20, 2006, the jury returned a verdict in favor of Lammers and awarded him $600,000. According to Bedo and Andring, immediately after the trial, Fire Chief French and the former president of the firefighters' union told them that they were "in trouble" and that defendant would "go after them" because of their testimonies in the Lammers case.

On June 23, 2006, Mayor Larry Salisbury filed departmental charges against Bedo, including: (1) conduct unbecoming an officer; (2) insubordination; (3) failing to follow a chain of command; (4) dissuading firefighters from performing their duties; and (5) criticism/ridicule. Police Chief George Anthony conducted disciplinary hearings on the charges on June 30, 2006, July 6, 2006, and July 14, 2006. The evidence presented at the hearings focused on the department report Bedo had submitted to Fire Chief French, but a substantial portion of the evidence suggested that Bedo was responsible for the death of a firefighter in the early 1990s.

According to Bedo, he was "forced to retire" in late July 2006 because of the "stress created by the mayor's actions after [he] testified for the Plaintiff against the City of Ecorse in [the] Lammers trial." Defendant denied Bedo's requests for a "cash out," his pension, and to transfer pension plans. On July 21, 2006, Bedo filed suit against defendant, raising a claim under the WPA. Bedo claimed that defendant brought the departmental charges against him, subjected him to the disciplinary hearings, forced him to retire, and withheld his benefits because of his testimony at the Lammers trial.

On August 15, 2006, Police Chief Anthony submitted his findings to Mayor Salisbury. On the basis of the evidence presented at the disciplinary hearings, he upheld four out of the five charges filed against Bedo and issued this decision: "Captain John Bedo should not be assigned to any command or supervisory level position. I direct that Captain John Bedo be immediately demoted from the rank of captain to firefighter. In addition, I further direct that Captain Bedo undergo a physical and psychological examination to determine his continued fitness for duty."

### B. FACTS IN DOCKET NO. 280693

Shaw was born on March 18, 1938. He worked for the city of Ecorse Police Department from 1968 to 2004. He became deputy chief in 1999. In 2001, when Shaw was 63 years old, defendant appointed him as police chief. In June 2004, John Clark, an attorney working on a contractual basis for defendant, sent a letter to Mayor Salisbury and the city council stating that under the city charter, "[a]ny Fireman or Policeman who attains the age of sixty (60) years shall be retired and pensioned as herein provided," that pursuant to that provision, Shaw should be "considered retired effective immediately," and that any further contractual relationship with Shaw would be in violation of the charter. Shaw responded to the letter, stating that he had no intention of retiring as police chief before August 2005 and that he disagreed with Clark's reading of the charter. Shaw explained, "Mr. Clark's opinion ignores the fact that you hired me [on a contractual basis] when I was over age 60. I believe that I will have claims against the City if I am wrongfully removed from my position."

On August 2, 2004, the city council voted to relieve Shaw of his duties as police chief. The resolution stated that pursuant to the city charter, Shaw had been serving on a month-to-month basis since November 2001 and that he served "at the pleasure of the Mayor and council." Council members Brenda Banks, Nathaniel Elem, Gerald Strassner, and Arnold Lackey voted to remove Shaw. Councilwoman Julie Cox voted against removing him. Councilwoman Theresa Peguese was not present for the vote.

Later on August 2, Shaw received a telephone call from a coworker informing him that the city council had voted to remove him from his position. At the time, Shaw was in Nebraska for his grandson's brain surgery.

More than two weeks later, on August 20, 2004, Shaw wrote the mayor and city council a letter, stating the following:

> It has been brought to my attention that I have been removed from my position as Chief of Police with the city of Ecorse even though I have received no official written or verbal notice to this effect. If this is indeed the fact, I am hereby requesting that I begin receiving my retirement benefits immediately. Since it is not my choice to retire at this time, I make this request under protest.

Shaw subsequently requested "back pay," a "cash out" of leave already accrued, and a pension plan transfer. Defendant offered at least two pension plans to its employees: the City Charter Pension Plan (Charter plan) and the MERS (Municipal Employees Retirement System) plan. Retirees were entitled to 65 percent of their final average compensation (FAC) under the Charter plan and 80 percent of their FAC under the MERS Plan, based on a 36-month period selected by the retiree. Shaw was a member of the Charter plan at the time of his retirement and requested to be transferred to the MERS plan. He believed he could make such a transfer under defendant's agreement with the Police Officers Association of Michigan (the POAM contract). Defendant initially denied all of Shaw's requests. In April 2005, several months after Shaw gave his notice of retirement, the board of trustees for the city retirement system adopted a resolution stating that Shaw was entitled to 50 percent of his FAC based on the period of its choosing. According to Shaw, he did not receive any pension benefits until May 2005.

### C. PROCEDURAL HISTORY

In September 2005, Shaw filed suit against defendant, alleging age discrimination and breach of con-

tract, among other claims. In July 2006, Bedo was added to Shaw's second amended complaint as a coplaintiff, raising his claim under the WPA. Thereafter, defendant moved for summary disposition of both plaintiffs' claims. The trial court denied defendant's motion with regard to Shaw's claims, but reserved ruling on Bedo's claims.

Shaw's case proceeded to trial in June 2007. The jury returned a verdict in favor of Shaw. Defendant subsequently moved for a new trial or remittitur. The trial court denied the motion. In August 2007, the trial court heard additional oral arguments on defendant's motion for summary disposition of Bedo's claims and granted the motion.

## II. BEDO'S WPA CLAIM

Bedo argues that the trial court erred in granting defendant summary disposition with regard to his WPA claim. We agree.

We review a trial court's decision on a motion for summary disposition de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, we consider all the evidence submitted by the parties in the light most favorable to the nonmoving party. *Maiden, supra* at 120. Summary disposition should be granted only where the evidence fails to establish a genuine issue regarding any material fact. *Id.* The interpretation and application of a statute involve questions of law that this Court reviews de novo on appeal. *Lincoln v Gen Motors Corp*, 461 Mich 483, 489-490; 607 NW2d 73 (2000).

Bedo brought his whistleblower claim under MCL 15.362, which states:

An employer shall not discharge, threaten, or otherwise
discriminate against an employee regarding the employee's
compensation, terms, conditions, location, or privileges of
employment because the employee, or a person acting on
behalf of the employee, reports or is about to report,
verbally or in writing, a violation or a suspected violation of
a law or regulation or rule promulgated pursuant to law of
this state, a political subdivision of this state, or the United
States to a public body, unless the employee knows that the
report is false, or because an employee is requested by a
public body to participate in an investigation, hearing, or
inquiry held by that public body, or a court action.

"To establish a prima facie case under this statute, a
plaintiff must show that (1) the plaintiff was engaged in
protected activity as defined by the act, (2) the plaintiff
was discharged or discriminated against, and (3) a
causal connection exists between the protected activity
and the discharge or adverse employment action." *West
v Gen Motors Corp*, 469 Mich 177, 183-184; 665 NW2d
468 (2003). If a plaintiff is successful in establishing a
prima facie case under the WPA, the burden shifts to
the defendant to establish a legitimate business reason
for the adverse employment action. *Roulston v Tender-
care (Michigan), Inc*, 239 Mich App 270, 280-281; 608
NW2d 525 (2000). Once the defendant produces such
evidence, the plaintiff has the burden to establish that
the employer's proffered reasons were a mere pretext
for the adverse employment action. *Id*. at 281.

In this case, the trial court found that Bedo failed to
establish a prima facie case under the WPA because he
was not engaged in protected activity. The trial court
stated:

This case is a Whistleblower's case or at least the one
claim, and essentially the Whistleblower's Act provides any
employer–or an employer shall not discharge, threaten, or
otherwise discriminate against an employee regarding the
employee's compensation, terms, conditions, locations, or

privileges of employment because the employee or a person acting on behalf of the employee reports or is about to report verbally or in writing a violation or suspected violation of law or a regulation or rule promulgated pursuant to law of the state. And it says reporting should be to a public body or something like that and in a court.

And I really, as I read over Mr. Bedo's testimony, he talked about a lot of political stuff, but I don't really recall seeing him or reading that he reported some kind of violation of the law against that current administration . . . .

Well, I think the plaintiff's only cited [*Henry v Detroit*, 234 Mich App 405; 594 NW2d 107 (1999)] and I read that over, and [it] is a lot different from this particular case . . . .

\* \* \*

So really in [*Henry*], you really do have some Whistleblower activities that he testified to in a court proceeding . . . .

And I really, frankly speaking, in reading over Bedo's testimony during the trial don't see that he did anything close to this in terms of Whistleblowing activity. And the issue in [*Henry*] seemed to surround what was a court proceeding under the statute as a case being a public body [sic] and that kind of thing.

I just don't see the Whistleblower activity here on the part of Bedo. He came in, just testified to what was going on. I don't think he clearly established any violation of the law or suspected violation of the law. And so for that reason, even though he was disciplined later, I just don't see that there's a prima facie case of Whistleblower activity, so I am accordingly going to grant the motion for summary disposition with regard to Mr. Bedo. And that's the court's ruling.

Conversely, Bedo argues that he was engaged in protected activity when he testified under subpoena at a court proceeding where defendant's conduct was at

issue. We agree. In *Henry*, *supra*, this Court interpreted and applied the language of MCL 15.362, stating, in part:

> The plain language of the statute provides protection for two types of "whistleblowers": (1) those who report, or are about to report, violations of law, regulation, or rule to a public body, and (2) those who are requested by a public body to participate in an investigation held by that public body or in a court action. See *Chandler v Dowell Schlumberger, Inc*, 214 Mich App 111, 125; 542 NW2d 310 (1995) (D.E. SHELTON, J., dissenting), aff'd 456 Mich 395; 572 NW2d 210 (1998); Ruga & Kopka, Wrongful Discharge and Employment Discrimination, § 2.24, p 50. On the basis of the plain language of the WPA, we interpret a type 1 whistleblower to be one who, on his own initiative, takes it upon himself to communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation. In other words, we see type 1 whistleblowers as initiators, as opposed to type 2 whistleblowers who participate in a previously initiated investigation or hearing at the behest of a public body. If a plaintiff falls under either category, then that plaintiff is engaged in a "protected activity" for purposes of presenting a prima facie case. [*Henry*, *supra* at 409-410.]

"As indicated, a type 2 whistleblower is an employee who is 'requested by a public body to participate in . . . a court action.'" *Id.* at 412, quoting MCL 15.362. The WPA defines "public body" to include "[t]he judiciary and any member or employee of the judiciary." MCL 15.361(d)(*vi*). The *Henry* Court found that an employee who provides deposition testimony under subpoena in a court action where his employer's conduct is at issue meets the definition of a type 2 whistleblower. *Henry*, *supra* at 413. The Court explained:

> In the case at bar, by giving a deposition in a civil case, plaintiff clearly participated in a 'court action.' . . .

[D]eposition testimony is part of the trial or discovery process in civil litigation and is governed by the Michigan Court Rules. See generally MCR 2.300. . . . MCR 2.305(A), entitled "Subpoena for Taking Deposition," also provides that a party may subpoena another to give deposition testimony after suit has been commenced. A subpoena is a court-ordered command for the person to whom it is directed to attend and give testimony. MCR 2.306(3). Thus, a deponent who (a) is an employee of the entity whose conduct is at issue, (b) has provided testimony by a deposition and, thereby, has "participated in a court proceeding", and (c) would be subject to a court-ordered subpoena to compel his attendance in any event, meets the definition of a type 2 whistleblower. Specifically, in the instant case, plaintiff . . . had no choice but to give deposition testimony in the Lessnau case. Consequently, we are constrained to conclude that providing testimony in Lessnau's civil case, which involved both plaintiff's and Lessnau's employer and was pending in a state circuit court, meets the requirements for a type 2 whistleblower who "is requested by a public body to participate in a . . . court action." Indeed, as a deponent, plaintiff's attendance and testimony were compelled, which is certainly a higher standard than requested. We therefore find plaintiff's testimony to be an activity protected by the WPA. [*Henry*, *supra* at 412-413.]

Contrary to the trial court's findings in this case and defendant's argument on appeal, neither the plain language of MCL 15.362 nor this Court's interpretation of the statute in *Henry* requires a type 2 whistleblower to report or testify regarding a violation or suspected violation of a law, regulation, or rule.[1] Although the

---

[1] Defendant argues that a federal district court case, *Johnson v Lapeer Co*, 2006 US Dist LEXIS 76182, an unpublished opinion of the United States District Court for the Eastern District of Michigan, issued October 11, 2006 (Docket No. 04-74659), supports its argument that a type 2 whistleblower must testify about a violation of a law, regulation, or rule. But, *Johnson* is not binding on this Court and it does not stand for the proposition argued by defendant. Furthermore, its reasoning has since

plaintiff in *Henry* did, in fact, testify regarding an alleged violation of departmental rules by the defendants, such testimony is not required to qualify a person as a type 2 whistleblower under MCL 15.362. The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature, and the first criterion in determining intent is the specific language of the statute. *USAA Ins Co v Houston Gen Ins Co*, 220 Mich App 386, 389; 559 NW2d 98 (1996). Provisions not included in the statute by the Legislature should not be included by the courts. *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 103; 693 NW2d 170 (2005). The trial court clearly imposed on Bedo a requirement not included in MCL 15.362.

Recently, in *Kimmelman v Heather Downs Mgt Ltd*, 278 Mich App 569; 753 NW2d 265 (2008), this Court addressed whether the plain language of MCL 15.362 limits claims to those where the employee is reporting, about to report, or testifying about the conduct of his or her employer. In that case, an at-will employee had cooperated in the prosecution of a coowner of his employer for assaulting one of his coworkers after working hours. *Id.* at 571. The employee's employment was terminated, and he sued his employer for allegedly retaliating against him for his cooperation in the criminal investigation. *Id.* at 572. Reading the plain and unambiguous language of MCL 15.362, this Court concluded that the "statute is not limited to violations by employers," and stated, in part:

> [T]he plain language of the statute is not limited to violations by employers. . . . The language in the WPA is unambiguous: an employee need only be requested by a public body to participate in *an* investigation, hearing,

been rendered invalid by *Kimmelman v Heather Downs Mgt Ltd*, 278 Mich App 569; 753 NW2d 265 (2008), discussed later in this opinion.

inquiry, or court action (or, under the first part of the statute, report or be about to report *a* violation of law). There is absolutely nothing, express or implied, in the plain wording of the statute that limits its applicability to violations of law *by the employer* or to investigations *involving the employer*. [*Kimmelman, supra* at 574-575 (citations omitted; emphasis in original).]

Footnote 2 of *Kimmelman* states, in part:

The Legislature intended the WPA to serve a vitally important and far-reaching goal: protection of the public by protecting *all* employees who have knowledge that is relevant to the protection of the public from some abuse or violation of law and who, for whatever reason, might fear that their employers would not wish them to divulge that information or otherwise participate in a public investigation. The Legislature clearly intended to maximize employees' involvement by removing as much doubt as possible regarding whether those employees will face negative consequences. Moreover, the Legislature clearly did not intend the WPA to protect the public *only* from violations of law or abuses by employers, but rather from violations of law or abuses *in general*. [*Id*. at 574 n 2 (emphasis in original).]

In this case, former Fire Chief Lammers filed suit against defendant for racial discrimination and breach of contract. Bedo was subpoenaed and testified on behalf of Lammers. In other words, Bedo testified under subpoena, i.e., at the request of a public body, at a court proceeding. Accordingly, we find that Bedo was engaged in activity protected by the WPA as a type 2 whistleblower. Furthermore, although Bedo may not have testified about a specific violation of law, regulation, or rule committed by defendant, Lammers's attorney stated in his affidavit that Bedo's testimony directly contradicted that of several defense witnesses and substantiated many of Lammers's claims. Bedo testified, among other things, that he heard city council members say that they wanted to "get rid of Lammers," that the

city council hired people for positions in the fire department who were not qualified for their positions, that both he and Lammers had been mistreated by the city council, and that he heard a city council member refer to the fire department as being "lily white."

Defendant further argues that Bedo was not engaged in protected activity because his testimony did not relate to a matter of public concern. Defendant is correct that the underlying purpose of the WPA is the protection of the public. *Henry, supra* at 409. But, as this Court stated in *Henry*, "[t]he act meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law. Without employees who are willing to risk adverse employment consequences as a result of whistleblowing activities, the public would remain unaware of large-scale and potentially dangerous abuses." *Id.* (quotation marks and citations omitted). In this case, Bedo's testimony helped bring to light discriminatory acts committed by city officials, a matter that is certainly of public concern. Cf. *Id.* at 413 n 1.

Alternatively, defendant argues that even if Bedo was engaged in protected activity, he failed to establish a causal connection between the protected activity and the adverse employment action. The trial court did not address this issue, and we conclude that a material question of fact exists with regard to causation.

A plaintiff may establish a causal connection through either direct evidence or indirect and circumstantial evidence. Direct evidence is that which, if believed, requires the conclusion that the plaintiff's protected activity was at least a motivating factor in the employer's actions. *Sniecinski v Blue Cross & Blue Shield*, 469 Mich 124, 132-133; 666 NW2d 186 (2003). To establish

causation using circumstantial evidence, the "circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994). Speculation or mere conjecture "is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference." *Id.* (quotation marks and citation omitted). In other words, the evidence presented will be sufficient to create a triable issue of fact if the jury could reasonably infer from the evidence that the employer's actions were motivated by retaliation. See *Taylor v Modern Engineering, Inc*, 252 Mich App 655, 661; 653 NW2d 625 (2002).

In this case, Bedo claims that defendant brought departmental charges against him, subjected him to disciplinary hearings, forced his retirement, and withheld his retirement benefits because of his testimony at the Lammers trial. A jury returned a verdict in favor of Lammers on June 20, 2006. Three days later, on June 23, 2006, Mayor Salisbury filed the charges against Bedo. A temporal connection between protected activity and an adverse employment action does not, in and of itself, establish a causal connection, *West, supra* at 186, but it is evidence of causation, see, e.g., *Henry, supra* at 414. In addition to the "temporal connection," Bedo presented evidence that immediately after the Lammers trial, both he and Andring were told by Fire Chief French and the former president of the firefighters' union that they were "in trouble" and that defendant would "go after them" because of their testimonies. Bedo also presented evidence that defendant's disciplinary actions against him were unusual. He presented the affidavit of union president Scott Douglas stating that the "mayor's action in setting a hearing on John Bedo was unprecedented," and that Bedo's "response to the

order that threatened the safety of firefighters was appropriate and certainly not something that should have provoked the response it did." Bedo testified that to his knowledge, no other firefighter had ever been subjected to a "mayor's hearing" or denied a request to "cash out."

Defendant claims that disciplinary actions were taken against Bedo because of his June 9, 2006, departmental report about firefighter and citizen safety. Bedo claims that defendant's response to his report was unprecedented and completely disproportionate, and that the report was a mere pretext for disciplining him. He claims that defendant's actions were done in retaliation for his testimony at the Lammers trial and he presented circumstantial evidence in support of his claim. We find that the evidence presented by Bedo, viewed in the light most favorable to him, created a material question of fact regarding the cause of the adverse employment action.

In sum, we hold that Bedo engaged in activity protected under the WPA, that a material question of fact exists regarding causation, and therefore, that the trial court erred in granting defendant summary disposition.

### III. SHAW'S AWARD OF NONECONOMIC DAMAGES

Defendant argues that the trial court abused its discretion by denying its motion for a new trial or remittitur of the jury's award of noneconomic damages to Shaw. We disagree.

A new trial may be granted when excessive or inadequate damages apparently influenced by passion or prejudice were awarded or when the verdict was clearly or grossly inadequate or excessive. MCR 2.611(A)(1)(c), (d); MCL 600.6098(2)(b)(*iv*), (*v*); *McManamon v Redford Charter Twp*, 273 Mich App 131, 139; 730 NW2d

757 (2006). If, however, the reviewing court determines that the only trial error is the inadequacy or excessiveness of the verdict, it may deny a motion for a new trial on the condition that, within 14 days, the nonmoving party consent in writing to the entry of a judgment in the amount determined by the court to be the lowest or highest amount the evidence will support. MCR 2.611(E)(1); *Burtka v Allied Integrated Diagnostic Services, Inc*, 175 Mich App 777, 780; 438 NW2d 342 (1989); see also MCL 600.6098(2)(d).

In determining whether remittitur is appropriate, a trial court must decide whether the jury award was supported by the evidence. *Diamond v Witherspoon*, 265 Mich App 673, 693; 696 NW2d 770 (2005). This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented, such as whether the award was influenced by bias or prejudice or whether the award was comparable to those in similar cases. *Palenkas v Beaumont Hosp*, 432 Mich 527, 532; 443 NW2d 354 (1989); *Diamond*, *supra* at 694. The power of remittitur should be exercised with restraint. *Hines v Grand Trunk W R Co*, 151 Mich App 585, 595; 391 NW2d 750 (1985). If the award falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, it should not be disturbed. *Palenkas*, *supra* at 532-533. A trial court's decision regarding remittitur is reviewed for an abuse of discretion. *Id*. at 533. We review all the evidence in the light most favorable to the nonmoving party. *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 499; 668 NW2d 402 (2003).

In this case, the jury awarded Shaw $1.5 million in past noneconomic damages and $250,000 in future noneconomic damages. In denying defendant's request

for remittitur, the trial court stated that there was considerable evidence presented at trial about the emotional damage Shaw suffered as a result of being relieved of his duties and that, considering the evidence presented, the court could not conclude that the award was excessive. On appeal, defendant does not assert that any improper methods were used at trial and admits that Shaw suffered at least some mental anguish and humiliation as a result of its actions. Nonetheless, defendant argues that the amount of the jury's award was unsupported by the evidence. We disagree.

Shaw testified that he felt embarrassed, humiliated, and betrayed by defendant's actions. Shaw's wife, Maureen Garza-Shaw, testified that before he was removed from his position as police chief, Shaw "lived and breathed" his job, was extremely active in the community, and loved Red Wings hockey, bowling, and other sports. When Shaw first learned that he had been removed, he and Maureen were in a hospital in Nebraska where their grandson had just undergone brain surgery. Shaw slid against the wall, hit the floor, and said, "They just fired me." Thereafter, Shaw became depressed, withdrawn, and lost interest in almost everything, including sports and family activities. Shaw's stepdaughter, Debra Petraska, similarly testified that Shaw loved his job and never complained about it. After he was removed from his position, Shaw became abnormally quiet, withdrawn, and depressed. He refused to participate in many of the things he previously enjoyed, such as traveling, watching sports, playing on his bowling league, community events, and even family barbecues.

Dr. Gerald Shiener performed a clinical psychiatric examination of Shaw and testified on his behalf. The doctor testified that after his removal, Shaw felt frus-

trated, embarrassed, and irritable. Shaw felt that his reputation in the community had been ruined, suffered sleeplessness, loss of appetite and sex drive, had bowel problems, and could not enjoy any of his previous activities. Dr. Shiener determined that Shaw was not fit for duty, diagnosed him with depression with features of posttraumatic stress disorder, and recommended that he undergo counseling.

Although Dr. Jeffrey Kezlarian's testimony suggested that Shaw was not depressed and suffered very little emotional damage from defendant's actions, with the exception of some initial embarrassment, the testimony of Shaw, his wife, his stepdaughter, and Dr. Shiener suggested otherwise. Considering that Shaw was removed from his office as police chief when he was 66 years old, after serving on the city police department almost his entire career, with little warning or explanation and while his grandson was having brain surgery, and that he suffered through months of defendant's refusal to pay his retirement benefits, we hold that the jury's award of noneconomic damages for mental and emotional harm was supported by the evidence.

Defendant further argues that the amount of noneconomic damages awarded in this case far exceeds the amounts awarded in comparable cases. Defendant listed nine cases that it claims are comparable to this case. However, most of defendant's examples are deficient. In the first case defendant cites, *Wilson v Gen Motors Corp*, 183 Mich App 21, 40; 454 NW2d 405 (1990), this Court held that the trial court did not abuse its discretion in reducing the jury's award of $750,000 for mental anguish to $375,000. But, the Court specifically stated that the plaintiff had only presented evidence of her own subjective feelings and that the amount of the award stemmed from the jury's desire to

punish the defendant. *Id*. Also of note is the fact that *Wilson* is a 1990 case. In another case cited by defendant, *Clopp v Atlantic Co*, 2002 US Dist LEXIS 18898, an unpublished opinion of the United States District Court for the District of New Jersey, issued October 7, 2002 (Docket No. 00-1103), the court remitted the damages awarded from $300,000 to $75,000, but specifically noted that the plaintiffs did not suffer loss of employment and that some of the emotional distress indicated in testimony could not be attributed to the defendants. Moreover, the final five cases cited by defendant, with awards ranging from $17,825 to $250,000, are trial court judgments that provide absolutely no explanation for the amount of damages awarded.

Shaw also listed several "comparable" cases in his brief on appeal. In *Diamond*, *supra*, and *Olsen v Toyota Technical Ctr*, unpublished opinion per curiam of the Court of Appeals, issued December 27, 2002 (Docket No. 229543), this Court affirmed the trial court's decisions to deny remittitur. The Court upheld a jury award of $2,625,000 to the three plaintiffs in *Diamond* for depression and anxiety, and an award of $5 million to the plaintiff in *Olsen* for emotional distress. Like the final five cases cited by defendant, the two trial court judgments cited by Shaw, with awards of over $2 million, offer no explanation for the amount of the awards.

Given the wide range of awards in the cases cited by the parties and the evidence Shaw presented at trial regarding the emotional and mental anguish he suffered because of defendant's actions, we hold that the trial court properly denied defendant's request for remittitur. Defendant argues that the noneconomic damages awarded Shaw were so extreme that they were

meant to be punitive or exemplary. But, because the evidence presented at trial supported the amount of the jury's award, defendant cannot establish that the award was meant as punishment. The trial court, having heard the testimony and seen the evidence as well as the jury's reactions, was in the best position to evaluate the credibility of the evidence and make an informed decision, and we afford its decision due deference. *Palenkas, supra* at 534.

### IV. SHAW'S AWARD OF PENSION BENEFITS

Defendant next argues that we should remand for remittitur of the jury's award of pension benefits, because the jury wrongfully concluded that Shaw was entitled to transfer to the MERS plan and receive 80 percent of his FAC. We disagree.

At trial, Shaw presented evidence about two of the pension plans available to defendant's employees: the MERS plan and the Charter plan. During closing arguments, Shaw's attorney argued that Shaw was entitled to transfer to the MERS plan under § 53.18 of the POAM contract, even after he had retired, and that as a member of the MERS plan, he would be entitled to 80 percent of his FAC. A copy of the POAM contract was provided for the jury's review. When the jury returned its verdict, the foreperson specifically stated that the jury determined that Shaw was entitled to 80 percent of his FAC and calculated his award of pension benefits accordingly.

Defendant now asserts that Shaw could not transfer to the MERS plan after he had retired under a proper interpretation of the POAM contract and he was therefore entitled to 65 percent of his FAC. At trial, defendant argued that Shaw was entitled to only 50 percent of his FAC, and failed to raise any argument about the

proper interpretation of the POAM contract. Nor did defendant raise the argument in its motion for a new trial or remittitur. Therefore, this issue is unpreserved for appellate review. *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 315-316; 660 NW2d 351 (2003). Further, any challenge to the sufficiency of the evidence in a civil case is waived by a party's failure to raise the issue in a timely motion at trial. *Napier v Jacobs*, 429 Mich 222, 238; 414 NW2d 862 (1987). By failing to challenge the sufficiency of the evidence regarding the pension benefits awarded in its motion for a new trial or remittitur, defendant has effectively waived the issue. Nonetheless, we will briefly address the merits of the claim.

If a contract's language is clear, its construction is a question of law that is subject to review de novo. *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 408; 646 NW2d 170 (2002). But interpretation of an ambiguous contract is question of fact that must be decided by a jury. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003). A contract is ambiguous if the words may reasonably be understood in different ways or the provisions irreconcilably conflict with each other. *Id.* at 467.

At trial, the parties stipulated that Shaw was a third-party beneficiary of the POAM contract. Section 53.18 of the contract provides: "Employees may elect to transfer to MERS Pension Plan B-3 . . . and earn benefits accordingly under that plan, as modified herein, and have all past employee contributions to the Ecorse Police & Fire pension plan refunded to employees by the Ecorse Police & Fire Pension System."

Defendant asserts that § 53.18 does not apply to Shaw because he was not a current or active employee when he attempted a pension plan transfer. On the other hand, Shaw asserts that the meaning of the term

"employees" in § 53.18 is ambiguous and the proper interpretation of the term was for the jury to decide. We agree with Shaw. As Shaw has pointed out, throughout the POAM contract, the term "employees" is used in a general sense, encompassing *all* employees–both active and retired. For example, § 53.26(H) of the contract states that in order to modify an MERS Plan, the employee "must be an active employee as of the date of the window" for modifications. Although § 53.26(H) is not at issue in this case, it demonstrates that the drafter of the POAM contract used phrases such as "active employee" when a section of the contract was intended to apply only to certain employees. Likewise, § 53.27 of the contract refers to benefits for both "transferred active employees" and "transferred retired employees," indicating that the drafter of the contract used modifiers such as "active" and "retired" to differentiate between different types of employees. Thus, the term "employees" in § 53.18, standing alone without a modifier, could be interpreted to mean either an active employee or a retired employee, or both. Because the term is equally susceptible to more than one meaning, its meaning is ambiguous and is for the jury to determine. *Klapp, supra* at 470.

Further, we note that § 53.18 makes no reference to a specific time frame for transferring pension plans. Other sections of the contract include references to a time frame, such as § 53.14(B), which states that "Before the effective date of the member's retirement or conversion from a disability retirement . . . , but not thereafter, a member may elect to receive his or her benefit . . . ." The drafter of the contract did not include such a provision in the section at issue.

Although it seems a bit unusual that an employee would be permitted to transfer pension plans after

retirement, "ambiguities are to be construed against the drafter of the contract." *Klapp, supra* at 470. We conclude that the meaning of the term "employees" in § 53.18 was a question properly submitted to the jury and that the jury's interpretation of the term was reasonable in light of the evidence presented. Remittitur of the jury's award of pension benefits is not warranted.

V. ADMISSION OF TESTIMONY ABOUT THE DEPUTY CHIEF POSITION

Finally, defendant argues that the trial court abused its discretion in admitting the testimonies of James Francisco and Willie Tolbert, Jr., about the deputy chief position because they were irrelevant and unfairly prejudicial. Again, we disagree.

At trial, Francisco testified that in the summer of 2004, he applied for the deputy chief position in the city of Ecorse Police Department. He underwent a series of oral interviews in late July 2004, conducted by three separate groups. The first group consisted of three city council members, including Cox and Elem. Before the interview started, Cox asked Francisco how old he was. When Francisco said that he was 60 years old, Elem stood up and said, "You're too old for the job, you'll just be wasting our time." According to Francisco, Elem left the room to obtain legal advice and, when he returned, said, "We'll go ahead and interview you, but I don't think it'll do any good." During the interview, Cox said, "It's too bad you're not 59." Francisco was not selected for the position. Tolbert testified that he also applied for the deputy chief position, but was never interviewed. When Tolbert questioned Elem about the interviews, Elem said that Tolbert was "too old" and gave him a copy of the city charter provision stating that policemen must be less than 60 years old. At the time, Tolbert was 63 years old.

Defendant argues that Elem's statements to Francisco and Tolbert that they were too old for the deputy chief position were irrelevant and unfairly prejudicial. We review preserved challenges to the admission or exclusion of evidence for an abuse of discretion. *Elezovic v Ford Motor Co*, 472 Mich 408, 419; 697 NW2d 851 (2005). Statements that are made outside the immediate adverse action context, generally referred to as "stray remarks," and that the plaintiff alleges to be direct evidence of bias, must be examined for relevancy using the following four factors: "(1) Were the disputed remarks made by the decisionmaker or by an agent of the employer uninvolved in the challenged decision? (2) Were the disputed remarks isolated or part of a pattern of biased comments? (3) Were the disputed remarks made close in time or remote from the challenged decision? (4) Were the disputed remarks ambiguous or clearly reflective of discriminatory bias?" *Krohn v Sedgwick James of Michigan, Inc*, 244 Mich App 289, 292; 624 NW2d 212 (2001). If the "stray remarks" are determined to be relevant, their probative value must be weighed against the risk of unfair prejudice. *Id.* at 302-303; MRE 403.

Elem's statements about Francisco and Tolbert's ages were relevant to establishing that age was a determining factor in Shaw's removal as police chief. To prevail on a claim of age discrimination, a plaintiff must establish that age was a determining factor in the adverse employment action. *Meagher v Wayne State Univ*, 222 Mich App 700, 709-710; 565 NW2d 401 (1997). Although the official "decision maker" in this case was the city council as a whole, Elem was a council member and voted to remove Shaw as police chief. In fact, Elem testified at trial that he asked the mayor's secretary to draft a resolution removing Shaw from his position and that he made the motion for the removal at

the next city council meeting. Clearly, Elem was an active participant in the decision making process, not an "uninvolved agent." Elem's statements to Francisco and Tolbert contradicted his testimony at trial that he did not believe Clark's letter about the age provision in the city charter and that he never based employment decisions on age. Elem unambiguously informed both Francisco and Tolbert, on separate occasions, that they did not qualify for the deputy chief position because of their ages and used the city charter as a justification. Further, Elem made these "stray remarks" within two weeks of the council's decision to remove Shaw.

Defendant argues that Elem's statements were irrelevant because they related to the deputy chief position, not the police chief position. But, there is a logical and important connection between the two positions. Not only were both positions at a senior level in the city police department, but the same group of people–the city council–decided who would fill them. In that way, this case is distinguishable from the case cited by defendant, *Schrand v Fed Pacific Electric Co*, 851 F2d 152, 156 (CA 6, 1988), where the "stray remarks" at issue were made by a person uninvolved in the defendant's decision to terminate the plaintiff's employment and there was no logical or reasonable connection between the remarks and the plaintiff's termination.

Additionally, we conclude that the challenged evidence was not unfairly prejudicial or misleading. Pursuant to MRE 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Waknin v Chamberlain*,

467 Mich 329, 334 n 3; 653 NW2d 176 (2002) (quotation marks and citation omitted). Elem's statements about Francisco and Tolbert's ages were highly relevant to an issue of consequence at trial, as indicated above. Further, while the evidence was damaging to defendant's case, there is no indication in the record that the jury gave it preemptive weight or was mislead by it in any way. Therefore, defendant has failed to establish that the evidence should have been excluded under MRE 403.

Finally, even if there had been an abuse of discretion, in light of all the evidence presented at trial, defendant cannot establish that the outcome of the case would have been any different but for the admission of the evidence. Error warranting reversal may not be predicated on an evidentiary ruling unless a substantial right is affected. MRE 103(a); *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004). Defendant removed Shaw as police chief when he was 66 years old and immediately replaced him with a younger man. Shortly before his removal, a city attorney drafted a letter stating that, under the city charter, Shaw should be "considered retired effective immediately" because of his age. Three council members testified that one of the reasons they voted to remove Shaw was that during their campaigns they promised to terminate his employment. But, the other council members testified that they recalled no such promises being made. Two council members testified that when they voted to remove Shaw, they believed that he wanted to retire or had already quit. But, there is absolutely no evidence in the record supporting such assertions. Further, at least two council members stated that Shaw was removed because of his age. In August 2004, Strassner told a newspaper reporter that Shaw was removed because he was over 60 years old. At trial, Strassner claimed that

he had lied to the reporter. Cox, who voted against releasing Shaw, testified that she believed his employment was terminated because of his age. This evidence was more than sufficient to support the jury's finding of age discrimination.

In Docket No. 279997, we reverse and remand for further proceedings consistent with this opinion. In Docket No. 280693, we affirm. We do not retain jurisdiction.