NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1137n.06

**No. 11-2583**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Nov 05, 2012*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| SALLY HILDEN; JEROME FLYNN, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| HURLEY MEDICAL CENTER; VARUNA | ) | DISTRICT OF MICHIGAN |
| TEWARI; SHEILA MOORE; DAVID | ) | |
| SZCZEPANSKI, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE:  SUTTON and GRIFFIN, Circuit Judges; and WELLS, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiffs Sally Hilden and Jerome Flynn filed suit against defendants Hurley Medical Center ("HMC"), Varuna Tewari, Sheila Moore, and David Szczepanski, alleging violations of Michigan's Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.361, *et seq.*  The district court determined that Hilden and Flynn failed to present evidence of a causal link between their protected activity and the adverse employment action taken against them.  Accordingly, it granted summary judgment in favor of defendants.  We affirm.

---

[*]The Honorable Lesley Wells, Senior United States District Judge for the Northern District of Ohio, sitting by designation.

I.

At times relevant to this case, Hilden and Flynn worked as medical technologists in the clinical laboratory at HMC, located in Flint, Michigan. Among other functions, the clinical laboratory processes microbiology specimens received from doctors' offices for the purpose of identifying bacteria. A physician uses a cotton swab to collect a specimen from a patient's wound, throat, or other site. The swab is then placed in a sterile plastic tube containing a nutrient liquid to facilitate bacteria growth. The swab and tube together are referred to as "transport media." Transport media is delivered to the clinical laboratory for processing. Once received, a medical technologist removes the swab from the tube and inoculates (i.e., "sets up") the culture on a culture plate or in a vial of Lim broth, referred to as "culture media." After bacteria grows, another staff member identifies the bacteria and provides a report to the physician.

Tewari is HMC's microbiologist; he is responsible for HMC's clinical laboratory, including the processing of microbiology specimens. Moore is the administrative director of the clinical laboratory, and Szczepanski is HMC's labor relations administrator.

On the afternoon of January 19, 2010, Sarah Martinson, a medical technologist, noticed that the clinical laboratory had received expired transport media. Martinson sent a message to HMC's "outreach troubleshooter group," the liaison between HMC and the doctors' offices, asking the troubleshooters to contact the physician's office and ask it to discard any other expired transport media in its inventory. The message indicated that Martinson had still inoculated the culture.

During the early morning hours of January 20, 2010, Hilden emailed the troubleshooters regarding the culture media prepared by Martinson. She asked the troubleshooters to request a new specimen from the physician and stated that the use of expired transport media violated a standard established by the Joint Commission for Accreditation of Hospitals Organization ("Joint Commission"), a nonprofit organization that regulates quality and safety in the delivery of healthcare. Hilden then discarded both the swab and the Lim broth that Martinson had prepared.

That afternoon, in an email, Tewari told the staff to notify the microbiology department when expired transport media was received so that physician offices could be notified. Nonetheless, he instructed the staff to prepare expired transport media for processing:

> I am insisting that cultures be set up because in many cases, patients do not return for recollection. Many of the clinics deal with patients that have poor compliance with medical instruction. Therefore, the best course of action is to set the culture up while we are waiting for a recollection. If pathogens are recovered, the patient will get treatment earlier than if we had to wait for a recollection. Obviously, a recollection is the only sure way to know that the specimen was not compromised, and we should always request another. But I think that we do owe it to the patient to get started on the work as quickly as we can.

According to Tewari, the expiration date that appears on transport media provides a conservative, suggested date after which the reliable identification of bacteria is not guaranteed. Still, he stated that processing transport media after the expiration date is sometimes "perfectly okay" and can yield a valid result. He explained that the patient is not harmed by processing expired transport media because the worst-case scenario is a false negative; there is no risk of a false positive so long as the packaging remains sterile. Indeed, in the event of a valid positive result, the patient is benefitted by the processing of expired transport media because the physician can begin treating

the bacteria sooner than if the laboratory had waited for a new specimen. As Tewari further noted, because requests for a new specimen are not always acted upon, destroying expired transport media can foreclose ever obtaining a valid positive result and treating the patient. Accordingly, Tewari indicated that there is no clinical basis to support destroying expired transport media.

After reading Tewari's directive, Hilden and Flynn went to their immediate supervisor, Emily Mahank, and voiced their objections to the processing of expired transport media. Mahank told them that she would notify Tewari regarding their concerns.

Early the next morning, January 21, 2010, Hilden discarded two swabs and culture plates from expired transport media that had been prepared for processing by another medical technologist. She sent a message to the troubleshooters, asking that they notify the physicians, but she did not mention that she had discarded the swabs and culture plates.

Later that same morning, Hilden and Flynn met with Moore, the administrative director of the laboratory, to discuss their concerns with Tewari's directive. They told Moore their belief that processing expired transport media violated Joint Commission standards. At the time, Moore did not know that Hilden had already violated Tewari's directive.

Following the meeting, Moore spoke with Tewari and asked him to call Megan Sawchuk, the individual responsible for interpreting the Joint Commission standards, to verify that he was correct on the issue of expired transport media. Tewari contacted Sawchuk as requested. Sawchuk responded to Tewari that afternoon:

> [T]he laboratory director may use clinical judgment to determine a reasonable specimen rejection policy when receiving expired collection or culture

materials. . . . If the laboratory has had experience with recovering significant isolates from expired materials and it is suspected that recollection will be difficult or impossible, it is reasonable to proceed and perform testing. The physician should be informed of the test limitations and that recollection is suggested. It is preferable to include this information in the laboratory report as a comment or disclaimer.

In light of this response confirming his position, Tewari sent another email to the staff instructing them to include a comment on laboratory reports of expired transport media to let the physicians know that the results may be suspect and to discard any remaining expired media in their inventory. The email did not indicate that anyone had contacted the Joint Commission or that Sawchuck had endorsed Tewari's rationale for processing expired transport media.

When Moore discovered that Hilden had destroyed swabs and culture plates in violation of Tewari's directive (which had not been retracted), she contacted Szczepanski, the labor relations administrator. She informed Szczepanski that she wanted to suspend Hilden pending permission to discharge her for insubordination following an investigation. In the meantime, Moore did not feel that she could allow Hilden to work. Szczepanski advised Moore to place Hilden on paid administrative leave until a meeting could be arranged with a union representative.

On January 22, 2010, Moore notified the public safety department that she planned to place Hilden on administrative leave and the situation had "the potential to be ugly." Tewari agreed to be present when Moore confronted Hilden. Moore spotted Hilden walking down the hall and said that she needed to speak with her. Hilden asked if she had a union representative. When Moore replied that she did not, Hilden said, "then I'm not talking to you." Hilden walked past Moore and Tewari, down the hall, and into the locker room. Moore followed. From the doorway of the locker room,

Moore told Hilden that she needed to speak with her and the matter did not require a union representative. Hilden refused to come out of the locker room.

Moore returned to her office and called Nancy Brooks, the house director. Moore explained the situation and that she was acting on Szczepanski's recommendation to place Hilden on administrative leave until the matter could be discussed with a union representative. Brooks came down to the laboratory to try to talk to Hilden. Brooks introduced herself to Hilden and asked if she would step out into the hall to talk. In response, Hilden said that she felt threatened and harassed by management, and she threatened to add Brooks to the list of people against whom she intended to file a complaint. Brooks explained that she was not harassing Hilden and only wanted to speak with her. At that point, Hilden called the public safety department to request an officer, claiming that management was threatening and harassing her. Moore explained the situation to the safety officers when they arrived. Ultimately, Moore placed Hilden on administrative leave until they could sit down with a union representative.

On January 27, 2010, Hilden filed an internal "unsafe workplace" complaint against Moore and Tewari, claiming that they had harassed and intimidated her. An investigation resulted in a finding that the complaint was unsubstantiated and the actions of management were professional and appropriate.

HMC sent Hilden a notice of discharge, effective March 10, 2010, citing acts of insubordination in discarding the swabs and culture plates in violation of Tewari's directive. Although Hilden had already been terminated, HMC sent her a second notice of discharge, effective

May 4, 2010. The second notice indicated that Hilden's filing of a false "unsafe workplace" complaint provided an additional basis for her discharge. At some point following Hilden's termination, during a lunch conversation with a former HMC employee, Moore bragged about firing Hilden and said that "she knew [Hilden] would get her job back but that it would be a very long time."

Meanwhile, Flynn also violated Tewari's directive, discarding a swab of expired transport media that had been prepared for processing by another medical technologist. Flynn's violation was less serious than Hilden's because he did not discard the culture plate, which allowed the laboratory to complete processing of the specimen, even though it had been cancelled. Comparatively, Hilden discarded the swabs and culture plates, which eliminated the possibility of processing. HMC suspended Flynn for fifteen days for his act of insubordination in discarding a swab in violation of Tewari's directive.

Hilden and Flynn filed suit in state court alleging five claims against defendants: (1) violation of the WPA with regard to Hilden; (2) violation of the WPA with regard to Flynn; (3) violation of Michigan public policy; (4) intentional infliction of emotional distress with regard to Hilden; and (5) violation of the First Amendment via 42 U.S.C. § 1983. Defendants removed the case to federal court, and the district court granted their motion for summary judgment on all claims.

In addressing the WPA claims, the district court found that two protected activities had occurred: (1) Hilden and Flynn made complaints regarding the use of expired transport media to Moore, Mahank, Szczepanski, and others; and (2) Hilden filed an "unsafe workplace" complaint

alleging stalking and harassment by management. With regard to the first protected activity, the district court held that Hilden and Flynn "furnished no evidence of a causal connection between their protected activity and their adverse employment actions." The court noted that the people to whom they expressed their concerns immediately took action to discover whether Tewari's directive contravened any rules or regulations. According to the district court, simply reporting what they believed was a violation of law did not result in discipline; rather, adverse employment action was taken only after it was discovered that they had deliberately violated Tewari's directive. Further, the district court found that the lunchtime conversation in which Moore bragged about firing Hilden did not constitute evidence of displeasure toward her for engaging in protected activity. At most, the conversation showed a personality conflict and Moore's displeasure with Hilden for refusing to speak with her.

With regard to the second protected activity, the district court held that evidence of causation was lacking because Hilden had already been fired when she filed the "unsafe workplace" complaint. The district court found that Hilden was terminated "for discarding swabs and culture media" and was sent a second notice of termination simply to complete the processing of a workplace grievance.

Hilden and Flynn timely appealed, limited to their claims under the WPA. They ask that we reverse the district court's judgment dismissing their WPA claims and remand the case to state court for further proceedings.

II.

We review a district court's decision on a motion for summary judgment de novo. *Savage v. Gee*, 665 F.3d 732, 737 (6th Cir. 2012). Summary judgment is proper when the record evidence, viewed in the light most favorable to the nonmoving party, reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *CareToLive v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011).

The WPA provides that "[a]n employer shall not discharge, threaten, or otherwise discriminate against an employee . . . because the employee . . . reports . . . a violation or suspected violation of a law or regulation . . . ." Mich. Comp. Laws § 15.362. On matters of substantive state law, we defer to the state courts. *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012). To establish a prima facie case under the WPA, the Michigan Supreme Court requires evidence that (1) the plaintiff was engaged in protected activity, (2) the plaintiff suffered an adverse employment action, and (3) a causal connection existed between the protected activity and the adverse employment action. *Shallal v. Catholic Soc. Servs. of Wayne Cnty.*, 566 N.W.2d 571, 574 (Mich. 1997).

A defendant is entitled to summary judgment "when a plaintiff cannot factually demonstrate a causal link between the protected activity and the adverse employment action." *West v. General Motors Corp.*, 665 N.W.2d 468, 472 (Mich. 2003) (per curiam). To demonstrate a causal link, it is not enough for a plaintiff to "show[] that his employer disciplined him after the protected activity occurred." *Id.* A plaintiff must show that he received discipline "*because of* [the] protected

activity." *Id*. As the Michigan Supreme Court has explained, "a temporal relationship, standing alone, does not demonstrate a causal connection between the protected activity and any adverse employment action. Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed." *Id.* at 472–73.

This case is premised on three protected activities: (1) the reporting of suspected violations of Joint Commission standards; (2) the filing of an "unsafe workplace" complaint; and (3) the commencement of the instant lawsuit. The issue on appeal is whether the district court properly concluded that Hilden and Flynn failed to present evidence of a causal link between their protected activity and the adverse employment action taken against them.

First, we agree that Hilden and Flynn failed to present evidence that they were disciplined *because of* reporting suspected violations of Joint Commission standards to their superiors. Their concerns were addressed in a timely fashion. Mahank told Hilden and Flynn that she would notify Tewari of their objections, and Moore promptly spoke with Tewari and asked him to look into whether his directive complied with the Joint Commission standards. Tewari received a response confirming that his directive to process expired transport media was reasonable. Disciplinary action was taken only after it was discovered that Hilden and Flynn had blatantly disregarded Tewari's directive. Hilden and Flynn admitted that they violated the directive, and HMC cited that violation as its reason for disciplining them.

Nonetheless, Hilden argues that a causal connection is shown through evidence of Tewari's and Moore's displeasure with her after she reported the suspected violations of Joint Commission standards. For evidence of displeasure to be relevant on the issue of causation, however, the displeasure must result from the protected activity. *See id.* at 473. Here, any displeasure that Moore and Tewari may have harbored toward Hilden stemmed, not from her voicing objections to superiors, but from her refusal to speak with Moore. Following Hilden down the hallway, calling for her in the locker room, and summoning the house director were nothing more than reasonable efforts to speak with Hilden. It was necessary for management to inform Hilden that she was being placed on administrative leave, and Hilden's attempt to avoid receiving the news is not evidence of causation.

Hilden also points to a lunch conversation in which Moore bragged about firing Hilden and said that "she knew [Hilden] would get her job back but that it would be a very long time." As the district court properly reasoned, the statement "suggests that a personality conflict existed between Moore and Hilden, but it does nothing to establish that Moore fired Hilden *because of* her decision to report a suspected violation of any law, rule, or regulation." (Emphasis added.) Simply, although some displeasure is discernable, the comment does not support an inference that the displeasure was "with the protected activity." *West*, 665 N.W.2d at 473.

Hilden and Flynn next assert that punishing them for discarding swabs and culture media was highly "unusual" because they were only following a policy that they believed prohibited the use of expired transport media. They rely on *Shaw v. City of Ecorse*, 770 N.W.2d 31, 41 (Mich. Ct. App. 2009) (per curiam), in which a panel of the Michigan Court of Appeals held that a fact question

existed on the element of causation where the disciplinary action taken against the plaintiff was unusual. In *Shaw*, the plaintiff firefighter testified against the city and was thereafter subjected to disciplinary hearings, forced to retire, and denied his request to "cash out." *Id.* at 34–35. This discipline was "unprecedented" and "disproportionate," and "no other firefighter had ever been subjected to [this type of discipline]." *Id.* at 41. Here, however, the action taken against Hilden and Flynn cannot be considered unusual under *Shaw*. Tewari's directive was clear. Hilden and Flynn do not argue that other employees who violated clear directives were not similarly disciplined. Firing or suspending an employee for insubordination is reasonable and otherwise unremarkable, and the discipline imposed in this case was proportionate, Hilden's misconduct being more serious than Flynn's.

Hilden and Flynn next claim that Tewari's directive was created in violation of existing policy and deviated from the procedure for establishing new rules outlined in the applicable Collective Bargaining Agreement ("CBA"). They cite *DeFlaviis v. Lord & Taylor, Inc.*, 566 N.W.2d 661, 666 (Mich. Ct. App. 1997) (per curiam), for the proposition that violations of standard operating procedures can provide evidence of an improper motivation or pretext. Plaintiffs' argument is based on a false premise. The Joint Commission interpreter confirmed that Tewari's directive *complied* with existing policy: "[T]he laboratory director may use clinical judgment to determine a reasonable specimen rejection policy when receiving expired collection or culture materials. . . . [When] it is suspected that recollection will be difficult or impossible, it is reasonable to proceed and perform testing." In other words, the directive did not violate the Joint Commission standards, but was a

valid interpretation of the existing policy for handling expired transport media. Further, Tewari's directive did not violate the CBA's mandate that HMC provide fifteen days' notice before implementing "reasonable work rules and reasonable regulations . . . *for the purpose of maintaining order and discipline.*" (Emphasis added.) Tewari's directive was not established to maintain order or discipline, but rather, it concerned a laboratory procedure established to serve patients who require prompt medical treatment and may be unlikely or unable to provide a new specimen for testing. Therefore, the directive does not constitute evidence of an improper motivation or pretext.

Hilden next argues that the second notice of termination, which references the filing of a false "unsafe workplace" complaint as an additional reason for her discharge, provides evidence of a retaliatory motivation. She contends that providing an additional reason for her discharge automatically gives rise to a mixed-motive claim under *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008), precluding summary judgment. Even under the single-motive paradigm of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Hilden argues that a fact question exists regarding causation because she refuted the assertion that her "unsafe workplace" complaint was false.

These arguments lack merit. "[I]n order to present a claim, either mixed-motive or single-motive, . . . a plaintiff must demonstrate that he has suffered an 'adverse employment action.'" *White*, 533 F.3d at 402; *see also West*, 469 Mich at 183–84 (listing "adverse employment action" as an element of a prima facie case). Michigan courts have defined "adverse employment action" under the WPA "as an employment decision that is materially adverse in that it is more than a mere

inconvenience or an alteration of job responsibilities and that there must be some objective basis for demonstrating that the change is adverse." *Heckmann v. Detroit Chief of Police*, 705 N.W.2d 689, 697 (Mich. Ct. App. 2005) (internal quotation marks omitted). Hilden cannot establish a prima facie case, mixed-motive or single-motive, based on the second notice of termination because it did not effectuate an adverse change in her employment—Hilden was already fired.

Undeterred, Hilden points to *Lindsey v. Outdoor Adventures, Inc.*, No. 278451, 2008 WL 4724320 (Mich. Ct. App. Oct. 23, 2008) (per curiam), an unpublished opinion in which the Michigan Court of Appeals relied on evidence that post-dated the actual firing to conclude that questions of fact existed on whether the firing was discriminatory. *Lindsey*, however, involved a sex-discrimination claim, whereas this case involves a retaliation claim. The difference is significant because an employer can harbor a discriminatory motive on an ongoing basis; therefore, post-termination comments can provide evidence that the employer had a discriminatory animus all along and that the firing was discriminatory, as in *Lindsey*. Logically, however, an employer can harbor a retaliatory motive only after, and in response to, protected activity.

Further, in *Shallal*, the Michigan Supreme Court held that the "plaintiff failed to establish a causal connection between the protected activity and her firing because she knew that she was going to be fired *before* she confronted her supervisor; thus, she used the information she had about the defendant's illegal activities as a guise to force the defendant to allow her to keep her job." *Shallal*, 566 N.W.2d at 576–77 (emphasis added). Similarly, in *Wolcott v. Champion International Corp.*, 691 F. Supp. 1052, 1058–59 (W.D. Mich. 1987), the court held that the plaintiff failed to

establish the element of causation where he knew of his impending discharge before he engaged in the protected activity. The WPA may not be used as a tool for extortion. *Id*.

In this case, Hilden was already apprised of and knew the reasoning behind her impending discipline long before she filed an "unsafe workplace" complaint. Accordingly, relying on *Shallal* and *Wolcott*, the district court determined that the second notice of termination was not evidence that Hilden's initial firing was retaliatory. Instead, it concluded that HMC sent Hilden the second notice simply to complete a workplace grievance process in which it was determined that Hilden's "unsafe workplace" complaint was baseless. Thus, although firing someone twice may seem illogical, viewing the evidence in context, we agree that the second notice of termination was a mere formality responding to Hilden's complaint, and there is nothing particularly "unusual" about it.

Lastly, Hilden argues that she presented evidence that she was terminated for filing the instant lawsuit. For reasons already stated, this argument fails. In short, HMC fired Hilden for insubordination *before* she filed the instant lawsuit, and sending her a second notice of termination (admittedly after she filed the lawsuit) did not constitute an adverse employment action under the WPA.

III.

For these reasons, we affirm.