# STATE OF MICHIGAN

# COURT OF APPEALS

---

TRACEY SAHOURI,

Plaintiff-Appellee,

v

HARTLAND CONSOLIDATED SCHOOLS and
JANET SIFFERMAN,

Defendants,

and

SCOTT VANEPPS,

Defendant-Appellant.

UNPUBLISHED
January 26, 2016


No.  321349
Genesee Circuit Court
LC No.  12-097958-CZ

---

TRACEY SAHOURI,

Plaintiff-Appellee,

v

HARTLAND CONSOLIDATED SCHOOLS,
JANET SIFFERMAN, and SCOTT VANEPPS,

Defendants-Appellants.

No.  321399
Genesee Circuit Court
LC No.  12-097958-CZ

---

Before:  METER, P.J., and WILDER and RONAYNE KRAUSE, JJ.

PER CURIAM.

In Docket No. 321349, defendant Scott VanEpps, the assistant superintendent of personnel and student services at defendant Hartland Consolidated Schools, appeals as of right an order denying his motion for summary disposition of plaintiff Tracey Sahouri's claims for defamation (count II) and false light invasion of privacy claims (count III) on governmental immunity grounds.  MCR 2.116(C)(7).  In Docket No. 321399, defendants Hartland Schools, VanEpps, and Janet Sifferman, the superintendent of Hartland Schools, appeal the same order by

-1-

leave granted, arguing that they were also entitled to summary disposition, under MCR 2.116(C)(10), of plaintiff's Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, claims (count I) and of the defamation and invasion of privacy claims against VanEpps. We reverse in part, affirm in part, and remand.

Plaintiff was previously a principal at one of Hartland Schools' elementary schools. In July 2011, she received a misdemeanor ticket for "hosting.[1]" The charges were dismissed in December 2011. Plaintiff later sued the township and an officer involved with the charges. She alleged malicious prosecution and retaliation for plaintiff's rejection of the officer's sexual advances. That case was settled for $150,000.

In September 2011, the Michigan Department of Education (MDE) received an anonymous tip that plaintiff had shared secure test items from a MEAP test booklet with staff at her elementary school. Investigators visited the school on October 4, 2011. Before the MDE released a report of its findings, plaintiff was transferred, in early November 2012, to the high school to serve as a vice principal. It is clear from the record that plaintiff viewed this transfer as a demotion.

On November 22, 2012, the MDE released a report and factual findings regarding its investigation. The report stated, in part:

> [A] staff member was able to recite the exact prompt that appears on the 2011 fourth grade writing test, even though the administration of the test had not yet occurred. In addition school test materials (test booklets) had been removed from their shrink-wrap packaging before the time necessary to distribute tests and were left openly on tables in an unsecured area arranged in grade-level collections (rather than what would be necessary for distribution).
>
> * * *
>
> The investigators also reported several instances when their requests were not honored. When investigators arrived at the school, they requested to meet with the principal [plaintiff] as soon as possible, but were left waiting in the front office for an extended period of time, during which time the principal called an impromptu meeting in her office with select staff. The investigators requested a quiet room away from the front office to interview staff, but the principal placed the investigators in a room within the front office that adjoined her office. The investigators felt this location compromised their ability to conduct private interviews. When the investigators requested a more suitable location, the principal denied their request despite the fact that front office staff indicated a different room was available. Additionally, the principal personally escorted some staff members to the interview location and did not present staff in the order requested by the investigators. Finally, the principal interrupted several

---

[1] We presume the hosting charge was pursuant to MCL 750.141a.

-2-

interviews and debriefed with staff after they met with investigators. The principal later approached the investigators and inquired why certain questions were being asked, acknowledging that she had been debriefed about the content of the private interviews.

The MDE also reported that a teacher described the climate at the school as "politically-charged" and divided among those who plaintiff favored and those who she forced out.

In response to the MDE's factual findings, plaintiff explained that Sifferman told her not to talk to the investigators until VanEpps arrived. VanEpps recalled telling plaintiff that someone from the Central Office should be present for the investigation; he was on his way, and to wait until he arrived. According to plaintiff, Sifferman and VanEpps decided where the investigators would conduct their interviews. VanEpps concurred that he suggested the conference room was available as long as it suited the MDE's needs. Sifferman denied any involvement with the location of the investigation.

Plaintiff also explained that she escorted teachers to the meetings to be sure their classes were supervised and the teachers knew they were entitled to break times. Plaintiff noted that the investigators did not ask to have the teachers interviewed in any particular order. Plaintiff testified that at least three teachers were very upset about the investigators' questions and that plaintiff learned about the questions when those teachers sought her out after their interviews for support. Plaintiff also testified that she only interrupted the interviews to remind one teacher of a prior commitment and to offer coffee and water to the investigators.

Sifferman also conducted an independent investigation of the MEAP violations. She learned that a teacher, Beth Woodbury, asked plaintiff to show her a copy of the third grade MEAP test, that plaintiff agreed, and that plaintiff urged Woodbury to lie to the MDE investigators about this incident. Sifferman found that plaintiff also showed the test to several other second-grade teachers. During the investigation and at her deposition, plaintiff admitted that she opened the "front page" of the third-grade MEAP test and showed it to Woodbury for three to five seconds. Plaintiff otherwise denied the allegations.

In January 2012, Sifferman told plaintiff not to attend administrative meetings and that she was planning to recommend that plaintiff's administrative contract not be renewed.

On March 26, 2012, the school board held an open meeting, which plaintiff attended. At that time, the board decided not to renew her contract. The board found:

> a. Misconduct regarding the administration of the MEAP test and resulting investigation by the Michigan Department of Education. Based upon the November 18, 2011 investigation summary from the Michigan Department of Education Bureau of Assessment and Accountability, plus the investigation conducted by the Hartland Consolidated Schools' administration, I find that you shared secure test items from a MEAP test booklet with select school staff, failed to secure test materials (test booklets), impeded the investigation by the Michigan Department of Education and failed to properly cooperate with the investigators from the Michigan Department of Education.

b.  You improperly pressured or influenced staff to be untruthful during the aforementioned investigation.

c.  You were untruthful during the investigation conducted by Hartland Consolidated Schools' administration regarding the MEAP test incident addressed in the aforementioned November 18, 2011 investigation summary.

d.  Staff complaints about you concerning your employment as the Creekside Elementary School Principal establish your inability to continue to serve effectively in that administrative position.  This resulted in the need to temporarily reassign you to a different administrative position during the 2011-12 school year.

e.  Your rapport and working relationships with Central Office administrators are unsatisfactory and lack the desired level of trust.

On March 27, 2012, Sifferman mailed a letter to plaintiff confirming that the board decided to not renew her administrative contract.  However, she would be reassigned as a teacher, effective June 30, 2012, and continue to enjoy the economic terms of her administrative contract until its expiration at the end of the 2012-2013 school year.

In April 2012, two students vandalized the outside of the high school with references to "24."  Hartland Schools determined that it was a prank.  A short time later, a "24-hitlist" was discovered in the bathroom at the high school.  Several administrators at the school, including Principal Chuck Hughes and Vice Principal Alice Lashbrook, thought the 24-hitlist in the bathroom was another prank.  Plaintiff averred that she was nevertheless uncomfortable about the 24-hitlist and reported it to the police on May 8, 2012.  Although Hughes could not recall plaintiff mentioning that she reported the incident to police, he appreciated plaintiff's concern and followed up by contacting parents of students involved.

On April 9, 2012, plaintiff filed a complaint against defendants alleging a violation of the WPA (count I); and charging that VanEpps committed defamation (count II), false light invasion of privacy (count III), and gross negligence (count IV).

On May 11, 2012, plaintiff suspected that a school board member's son was drinking alcohol and acting out at the school's prom.  Plaintiff reported the incident to Hughes.

On May 15, 2012, VanEpps provided plaintiff with a letter from Sifferman explaining that the administrative team at Hartland High School was transitioning.  Sifferman explained that she wanted the new team in place at the end of the year while the outgoing principal was still working and could assist the team.  Plaintiff, meanwhile, was placed on paid, administrative leave before the summer break and was still scheduled to begin teaching the following school year.

I.  DEFAMATION AND INVASION OF PRIVACY CLAIMS

We first address defendants' argument that the trial court should have granted summary disposition of the defamation claims (count II) and invasion of privacy claims (count III) pursuant to MCR 2.116(C)(10). We agree.

A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a claim. Summary disposition under MCR 2.116(C)(10) should be granted when the affidavits or other documentary evidence show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Smith v Globe Life Ins Co*, 460 Mich 446, 454-455; 597 NW2d 28 (1999). To avoid summary disposition under MCR 2.116(C)(10), the party opposing the motion must show, via affidavit or documentary evidence, that a genuine issue of fact exists for trial. *Id.* at 455-456 n 2; MCR 2.116(G)(4). A genuine issue of material fact exists when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008). The grant or denial of a motion for summary disposition is reviewed de novo. *Id.*

## A. DEFAMATION (COUNT II)

In *Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005), our Supreme Court identified the following elements of a defamation claim:

> "The elements of a defamation claim are: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (slander per se) or the existence of special harm caused by publication." [Citations omitted.]

"Communication" is "an act or instance of transmitting." Merriam-Webster's Collegiate Dictionary (2003).

In count II, plaintiff alleged that VanEpps falsely accused her of "incompetence, deliberate sabotage, unlawful conduct, and/or criminal and/or discriminatory wrongful conduct" in the performance of her job, that the accusations were false, and that VanEpps published the statements to third parties when he knew the accusations were false. However, at her deposition plaintiff testified that she could not identify any untrue statements VanEpps made to a reporter or any instances where he failed to support her in an interview with a reporter.

Although plaintiff stated that her attorneys were reviewing publications for examples of false statements, none were offered into the record. In the First Amended Complaint, plaintiff alleged multiple publications of the investigation results. However, these results were all published by MDE, not VanEpps. Furthermore, plaintiff alleged in her response to defendant's appeal that the false accusations were again published in a letter to plaintiff and at the board meeting on March 26, 2012. However, neither of these publications satisfies the requirements of defamation. The letter was addressed to and received by plaintiff. A letter addressed to and received by a plaintiff is not a communication to a third party. See *Ball v White*, 3 Mich App 579; 143 NW2d 188 (1966), and *Shawl v Spence Bros, Inc*, 280 Mich App 213; 760 NW2d 674 (2008). Also, the letter was signed by Janet Sifferman, who is not the party accused of

-5-

defamation. Furthermore, the board meeting minutes were created, signed, and published by a party other than VanEpps. Therefore, all indications of false statements in the record were made by other parties, and/or not communicated to a third person.

Plaintiff also alleges that VanEpps acted in bad faith throughout the time plaintiff was being defamed. Even if this were true, bad faith is not an element of defamation. *Mitan*, 474 Mich at 24. The attempt by plaintiff to use bad faith as an exception to the requirement of communication is an attempt to rewrite established precedent of the applicable law. Therefore, because plaintiff failed to offer evidence of any action by VanEpps to transmit a false statement, and relies on the argument that he acted in bad faith and that he either failed to act or remained silent when she was disciplined for following his instructions, there is no genuine issue of material fact, and VanEpps was entitled to judgment as a matter of law. The trial court erred by failing to grant summary disposition of count II.

## B. INVASION OF PRIVACY (COUNT III)

"In order to maintain an action for false-light invasion of privacy, a plaintiff must show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." *Duran v Detroit News, Inc*, 200 Mich App 622, 631-632; 504 NW2d 715 (1993). "Broadcast" means "to make widely known." *Merriam-Webster's Collegiate Dictionary* (2003).

In count III, plaintiff alleged that "statements, accusations and/or conduct" by VanEpps invaded her privacy in the following manner:

> (a) [He] put Tracey Sahouri, plaintiff, in a "false light in the public eye"; and
>
> (b) [He] indiscriminately and U [sic] disclosed private, confidential, and secret matters and information concerning Tracey Sahouri's employment with Defendant School, and her participation in the investigations of both the MDE and Defendants herein, to the public, in a way calculated to make Tracey Sahouri look bad.

Once again there is no evidence that VanEpps broadcast or took any action to make information widely known to the public. Again, plaintiff only argued that VanEpps acted in bad faith and took no action by remaining silent when she was disciplined for following his instructions. Absent proof of such a broadcast, there is no genuine issue of material fact and VanEpps was entitled to judgment as a matter of law. The trial court erred by failing to grant summary disposition of count III.[2]

---

[2] In light of our conclusion that VanEpps was entitled to summary disposition pursuant to MCR 2.116(C)(10) of counts II and III, we decline to address whether he also was entitled to governmental immunity for these torts and whether summary disposition would also have been

## II. WPA CLAIM

Next, defendants argue that the trial court erred by failing to grant their motion for summary disposition of plaintiff's WPA claims in Count I. We agree that the type 2 WPA claim should have been dismissed but disagree that the type 1 WPA claim should have been dismissed.

Section 2 of the WPA, MCL 15.362, states, in relevant part:

> An employer shall not . . . discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

To establish a prima facie case of retaliation under the WPA, the plaintiff must demonstrate: (1) that that plaintiff was engaged in a protected activity as defined by the act; (2) that he or she was fired or suffered some other serious adverse employment consequence; and (3) that there is a causal connection between the protected activity and discharge or adverse employment consequence. *Debano-Griffin v Lake Co Bd of Comm'rs*, 493 Mich 167, 175; 828 NW2d 634 (2013); *West v Gen Motors Corp*, 469 Mich 177, 183-184; 665 NW2d 468 (2003). As this Court explained in *Henry v City of Detroit*, 234 Mich App 405, 409-10; 594 NW2d 107, 110-11 (1999):

> The plain language of the statute provides protection for two types of "whistleblowers": (1) those who report, or are about to report, violations of law, regulation, or rule to a public body, and (2) those who are requested by a public body to participate in an investigation held by that public body or in a court action. On the basis of the plain language of the WPA, we interpret a type 1 whistleblower to be one who, on his own initiative, takes it upon himself to communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation. In other words, we see type 1 whistleblowers as initiators, as opposed to type 2 whistleblowers who participate in a previously initiated investigation or hearing at the behest of a public body. If a plaintiff falls under either category, then that plaintiff is engaged in a "protected activity" for purposes of presenting a prima facie case. [Citations omitted.]

---

appropriate under MCR 2.116(C)(7). In addition, because of VanEpps's failure to make any arguments in the trial court regarding summary disposition of the gross negligence claim in count IV, we decline to address his unpreserved arguments regarding that claim on appeal. See *Heydon v MediaOne of Southeast Mich, Inc*, 275 Mich App 267, 278; 739 NW2d 373 (2007).

A showing of causation requires more than a temporal relationship between the protected conduct and the subsequent adverse employment action. *Debano-Griffin*, 493 Mich at 177; *West*, 469 Mich at 186. "Plaintiff must show something more than merely a coincidence in time between protected activity and adverse employment action." *West*, 469 Mich at 186.

Cases involving retaliation under the WPA are reviewed under the same standards of proof used in other employment discrimination cases, including the use of the "*McDonnell Douglas* framework" when cases involve indirect evidence of retaliation. *Debano-Griffin*, 493 Mich at 176. Where a plaintiff presents a prima facie case, the burden shifts to the defendant to articulate and show a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant proffers such legitimate, nondiscriminatory reasons for its actions, the plaintiff must show, by a preponderance of direct or circumstantial evidence, that the employer's proffered reasons were merely a pretext for discrimination. Throughout the proceedings, the plaintiff's burden of proof remains to show that the employer's actions more likely than not were based on plaintiff's protected activity. *Debano-Griffin*, 493 Mich at 176; *Hazle v Ford Motor Co*, 464 Mich 456, 470-471; 628 NW2d 515 (2001).

## A. WPA—TYPE 2 CLAIM (COUNT I)

Defendant argues that plaintiff's Type 2 claim should have been dismissed because the WPA cannot immunize her from her own misconduct because she was a subject of a governmental investigation. We agree that plaintiff's WPA type 2 claim should have been dismissed, but based upon plaintiff's failure to show causation.

Plaintiff can establish the first two elements of a prima facie case for a Type 2 violation of the WPA, but not causation. First, according to the plain language of MCL 15.362, plaintiff was requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. Specifically, the MDE—a public body—requested that she participate in the MEAP investigation.

Second, the plain language of MCL 15.362 includes retaliation with respect to "compensation, terms, conditions, location, or privileges of employment." As defendants argue, plaintiff's compensation was never reduced, and plaintiff failed to offer any evidence that the leave of absence in May 2012 altered her compensation, terms, conditions, location, or privileges of employment. However, plaintiff was reassigned from serving as a grade school principal, to a temporary assignment as a high school vice principal, and then to a teaching position.[3] There is at least a question of fact regarding whether the accompanying changes in titles, new responsibilities, and different work locations altered the terms of plaintiff's employment.

---

[3] Defendants' reliance on *Wurtz v Beecher Metro Dist*, 495 Mich 242; 848 NW2d 121 (2014), is misplaced because, unlike the plaintiff in that case whose contract had expired at the time of the protected-activity, plaintiff was still under contract and employed as an administrator at the time of the alleged WPA violations.

Third, plaintiff cannot establish a causal connection between the MDE's request that plaintiff participate in the MDE investigation and the alleged adverse employment actions. "Participate" is defined in Merriam-Webster's Collegiate Dictionary (2003) as "to take part." The record does not demonstrate that plaintiff was discriminated against for taking part in the investigation. Rather, the record demonstrates that defendants supported plaintiff's cooperation with investigators.

Although plaintiff was disciplined for her obstruction of the MDE investigation—delays, compromising the privacy of interviews with other staff, manipulating the interview schedule, and interrupting some interviews—these infractions were not participation under the plain language of the WPA. The MDE concluded that plaintiff's infractions demonstrated her failure to honor the investigators' requests. As such, the infractions could not be part of plaintiff's allotted tasks in the investigation and do not constitute protected-participation as a matter of law. Discipline for the infractions therefore could not support plaintiff's claim that her participation in the protected activity caused the adverse employment actions.

Moreover, the mere fact that the adverse employment actions followed plaintiff's participation in the investigation is insufficient to establish the requisite causal connection. See *West*, 469 Mich at 186. "The fact that a plaintiff engages in a 'protected activity' under the Whistleblowers' Protection Act does not immunize him from an otherwise legitimate, or unrelated, adverse job action." *Id*. at 187. The MDE investigation found evidence showing that plaintiff disclosed the MEAP test contents. Therefore, the school's subsequent action against plaintiff, who had violated MEAP protocol, would be legitimate employment action. Therefore, the trial court erred by failing to grant summary disposition of the Type 2 WPA claim.

## B. WPA—TYPE 1 CLAIMS (COUNT I)

Defendants next argue that the trial court should have granted their motion for summary disposition of the Type 1 claims that they retaliated against plaintiff because she reported violations of a law, regulation, or rule to a public body. We disagree.

## 1. CRIMINAL CHARGE

Defendants argue that plaintiff did not engage in protected activity when she reported to defendants that she had been charged with hosting. We disagree.

MCL 15.362 applies to and protects an employee who "reports . . . a violation or a suspected violation of a law." Contrary to defendants' argument on appeal, no language in the statute limits the phrase "suspected violation" to require that the suspicion belong to the employee making the report. Nor does the statutory language require the employee making the report and the violator to be a different person. Under this broad language, an employee may indeed be protected under the WPA when reporting a prosecutor's suspicion that the employee, himself or herself, violated a law. See *Dudewicz v Norris-Schmid, Inc*, 443 Mich 68, 77; 503 NW2d 645, 649 (1993) ("[a]dmittedly, a strictly literal interpretation of the statute without an analysis of legislative intent arguably could lead to an interpretation that would bar discharge of an employee for reporting a crime by anyone under any circumstances").

Defendant further argues that the statute does not provide protection when the employee "knows the report is false." MCL 15.362. Plaintiff denied the allegations as "untrue and bogus." The charges were dismissed, and plaintiff ultimately recovered damages in a malicious prosecution lawsuit against the township and a police officer. Defendant argues that because plaintiff knew the suspected violation was false, reporting it was not a protected activity under the WPA. However, a false report means one not made in good faith. *Truel v City of Dearborn*, 291 Mich App 125, 138; 804 NW2d 744, 753 (2010). "In other words, reporting or being about to report violations or suspected violations is protected if the report is or is about to be made in good faith." *Id.* In this case, plaintiff reported this incident because she was required to do so by law. MCL 380.1230d. She did not lie about the report. She instead fulfilled her statutory duty as a teacher, which requires her to report all charges of listed offenses. MCL 380.1230d. Therefore, even though she did not believe that she was guilty, she made the report in good faith and thus was engaged in protected activity[4].

Defendants argue that plaintiff cannot create a question of fact regarding causation. However, in addition to the temporal proximity between the criminal charge and the adverse employment actions occurring in the fall of 2011 (including plaintiff's transfer to the high school), plaintiff also alleged that Sifferman was out to get her because of the criminal charge. She cited her affidavit recalling that Assistant Superintendent Scott Bacon told her that Sifferman felt pressure from the board regarding the criminal charge. Bacon disputed making such a statement. This factual question, the conflict between plaintiff's affidavit and Bacon's deposition, would be a question for the jury to resolve.

Furthermore, plaintiff argues that it is improper to grant summary disposition if there exists a question of fact on the issue of pretext. To support this argument, plaintiff cites a recently published case, *Pace v Edel-Harrelson*, 309 Mich App 256; ___ NW2d ___ (2015) (Docket No. 319223). Much like this case, there was conflicting testimony regarding the incidents that led to the plaintiff's termination. In *Pace*, the plaintiff denied intimidating a co-worker, and the supporting testimony from other parties regarding this incident was unpersuasive. *Id.* This court stated that "both asserted reasons for plaintiff's termination are grounded in conflicting testimony and questions of witness credibility. The weight to be given to this conflicting evidence is a question reserved for the finder of fact." *Id.*

In this case, plaintiff rebuts many of the proffered reasons for termination. For example, the school district stated that they were removing plaintiff from her administrative position at Creekside Elementary School because of her inability to continue to serve effectively in this position. The school district cited staff complaints as the basis of this conclusion. However, plaintiff offered evidence that she received high praise in an evaluation conducted by Sifferman two months prior to the MEAP investigation. This is just one example of a conflicting fact regarding the alleged reasons for termination. Because the reasons for terminating plaintiff

---

[4] It can also be said that technically plaintiff's report was literally accurate and, because all defendants are innocent until proven guilty, completely compatible with her belief of innocence.

involved conflicting testimony and questions of witness credibility, "the weight to be given to this conflicting evidence is a question for the finder of fact." *Id*.

The trial court did not err when it denied defendants' motion for summary disposition of this Type 1 claim related to plaintiff's criminal charge.

### 2. REPORTING STUDENT AFFAIRS AND FILING THE WPA LAWSUIT

Defendants also argue that plaintiff failed to establish that any reporting of student affairs or the filing of plaintiff's WPA complaint caused any adverse employment action. We disagree.

Under the plain language of MCL 15.362, an employee who "reports . . . a violation or a suspected violation of a law" is protected. Here, plaintiff reported a suspected threat to the police after she observed the 24-hitlist in the bathroom. She also reported to her principal that she suspected that a board member's son was intoxicated at the prom. She additionally filed a complaint alleging a violation of the WPA. All of these acts constitute reports of suspected violations of a law and therefore amounted to protected activities.

The protected activities occurred in April and May 2012. By that time, the decisions to transfer plaintiff to the high school, not to renew plaintiff's administrative contract, and to ultimately assign plaintiff to a teaching position had already been made. The only event plaintiff can establish that occurred after these protected activities was the decision to place her on paid leave on May 15. Defendants argue that plaintiff failed to offer any evidence that the paid administrative leave in May 2012 altered her compensation, terms, conditions, location, or privileges of employment. It is true that it did not alter her compensation, but it did alter a condition of her employment and her privileges of employment. It can be said that a condition of employment is that one must actually be at their place of employment. By putting plaintiff on leave, defendants are telling her not to show up. This could be seen as changing a condition of her employment.[5] Furthermore, a privilege of a job is the ability to perform it and reap the rewards of such performance. By putting plaintiff on leave, the school may have taken the privilege of being an assistant principal away from plaintiff. These acts establish an adverse employment action.

The defendants further argue that there is no genuine issue of fact regarding the connection between the protected activity and the adverse employment action.

---

[5] In *EEOC v Ford Motor Co*, 782 F3d 753, 761 (CA 6 2015), the court stated that "an employee who does not come to work cannot perform any of his job functions, essential or otherwise." The court then stated, "[R]egularly attending work on-site is essential to most jobs, especially the interactive ones . . . " *Id*. The court defined "essential functions as those that are "fundamental" (as opposed to 'marginal'), so that a job is fundamentally alter[ed] if an essential function is removed." *Id*. at 762. [internal citations and quotations omitted] Although decisions of lower federal courts are not binding on us, we find the reasoning in this case persuasive. Presumably, attendance at school is an essential function for a Vice Principal. When the school board eliminated this requirement, they fundamentally altered her employment.

However, plaintiff can, and did, establish a question of fact with both direct and circumstantial evidence. As this Court explained in *Shaw v Ecorse*, 283 Mich App 1, 14-15; 770 NW2d 31, 40-41 (2009):

> A plaintiff may establish a causal connection through either direct evidence or indirect and circumstantial evidence. Direct evidence is that which, if believed, requires the conclusion that the plaintiff's protected activity was at least a motivating factor in the employer's actions . . . To establish causation using circumstantial evidence, the circumstantial proof must facilitate reasonable inferences of causation, not mere speculation . . . Speculation or mere conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference . . . In other words, the evidence presented will be sufficient to create a triable issue of fact if the jury could reasonably infer from the evidence that the employer's actions were motivated by retaliation. *Id.* [citations omitted]

Plaintiff alleges that she was put on administrative leave shortly after reporting the prom incident involving the school board member's son, the 24 hit list, and filing her WPA claim.[6] "A temporal connection between protected activity and an adverse employment action does not, in and of itself, establish a causal connection, but it is evidence of causation." *Id.* at 16. [internal citation omitted]

Plaintiff also contends that around the time of the first drinking incident there was another drinking incident on the premises concerning a female student. The female student was issued a criminal citation, while the school board member's son was only given a five-day suspension. Furthermore, plaintiff discusses what she believed to be a departure from the normal administrative procedure when the school board immediately removed her from the assistant principal position and brought in a new principal near the end of the school year.

In fact, the school district sent plaintiff numerous letters regarding the non-renewal of her contract. In each letter it was stated that plaintiff would be reassigned June 30, 2012. It was not until the letter dated May 15, 2012, that plaintiff was notified of the decision to remove her as assistant principal of Hartland High School. This letter was sent four days after the prom drinking incident. Based upon the schools prior representations, it could be inferred that the sudden change of employment came as a result of the protected activities.

The above arguments, and the fact that the plaintiff was placed on administrative leave shortly after the prom incident, may allow a jury to make a reasonable inference that she was put

---

[6] At oral argument, appellant's counsel was asked to clarify why there was not a causal connection between the drinking incident at the prom and the adverse employment action. Appellant's counsel instead proceeded to talk about the 2009 hosting ticket involving plaintiff. This court is now left to draw reasonable inferences from the facts on hand, which tend to indicate that a jury could reasonably infer that the adverse employment was a result of the protected activity.

on administrative leave because of her protective activities. Therefore, the trial court did not error when it rejected defendant's motion for summary judgement regarding plaintiff's reporting of student affairs and filing of the WPA complaint.

## 3. ALLEGATIONS THAT OTHERS VIOLATED MEAP RULES

In paragraph 46 of her amended complaint, plaintiff alleged that she reported "that irregularities had been, and were still, occurring in connection with the administration or giving of so-called 'MEAP tests,' and that perhaps Defendants Superintendent and Assistant Superintendent were not doing their jobs in training people on what needed to be done." Plaintiff does not argue on appeal that she established a Type 1 violation regarding this allegation. The lower court record further demonstrates that plaintiff failed to create a genuine issue of material fact regarding whether she engaged in any protected activity by reporting violations by others regarding the MEAP. Therefore, the trial court erred when it failed to grant defendants' motion for summary disposition of the Type 1 claims involving plaintiff's allegations that others violated MEAP rules.

## IV. CONCLUSION

In summary, we reverse the trial court's order denying defendants' motion for summary disposition of the defamation claim (count II) and the invasion of privacy claim (count III). We reverse in part and affirm in part the order denying defendants' motion for summary disposition in regards to count I, the WPA claims. We reverse the order denying summary disposition for the WPA type 2 claim and the type 1 claim regarding plaintiff's reporting of MEAP violations. We affirm the order denying motion for summary disposition of the WPA type 1 claims concerning the reporting of plaintiff's criminal charges, the prom drinking incident, the 24 hit list, and the filing of the WPA claim. We remand for entry of a judgment dismissing counts I (In part as specified above), II, and III, and for further proceedings with respect to Count IV.

Reversed in part, affirmed in part and remanded for further proceedings. We do not retain jurisdiction. No costs because neither party prevailed in full. MCR 7.219 (A).

/s/ Patrick M. Meter
/s/ Kurtis T. Wilder
/s/ Amy Ronayne Krause

-13-