*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JAMES GLEASON,

Plaintiff-Appellant,

v

DELTA COLLEGE,

Defendant-Appellee.

UNPUBLISHED
May 30, 2019

No. 343076
Bay Circuit Court
LC No. 16-003811-NZ

Before: SHAPIRO, P.J., and BORRELLO and BECKERING, JJ.

PER CURIAM.

Plaintiff, James Gleason, appeals by right the trial court's order granting summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) in favor of defendant, Delta College, on plaintiff's claim brought under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*. The trial court determined that plaintiff failed to demonstrate causation between his protected activity of reporting a suspected violation of the Family Educational Rights And Privacy Act (FERPA)[1] and the adverse employment action of the termination of plaintiff's employment at Delta College. We affirm.

## I. BACKGROUND

Plaintiff began working at Delta College in June 2000 as an adjunct faculty member in the Electronic Media Broadcasting (EMB) program, which later was renamed the Electronic Media (EM) program. Plaintiff became a full-time faculty member in the fall of 2003 and received tenure in 2005. Kimberly Wells was hired, with plaintiff's endorsement, as an adjunct instructor in the program in January 2007. As an adjunct instructor, Wells reported to plaintiff. When she started, Wells had a desk in the corner of plaintiff's office before she later moved into her own office. Danielle Wright, a former student in the EMB program who had taken all of her

---

[1] 20 USC 1232g. FERPA generally protects the rights of parents and students to access student records and safeguards the privacy of student records. 20 USC 1232g.

-1-

classes with plaintiff, was hired to work as a part-time adjunct professor in the EMB program in August 2010. At some point, the department hired another adjunct professor, Matthew Hock.

Wells was promoted to Instructor in August 2010, placed on tenure track in January 2012, and promoted to Assistant Professor in 2013. Once Wells became a full-time faculty member, she and plaintiff had the same duties; however, plaintiff was the department's discipline coordinator in charge of scheduling, budgeting, curriculum management, and other administrative tasks. The discipline coordinator did not supervise other full-time faculty. Nevertheless, plaintiff believed himself to be Wells's supervisor and led Wells to understand that he was her supervisor. Wells only later learned that he was not her supervisor.

In February 2014, plaintiff decided to take a video-editing class away from Wells, which led to a disagreement between plaintiff and Wells. In the fall of 2014, when tensions between plaintiff and Wells had escalated and communication had deteriorated, Marcia Moore, Associate Professor of Communications and Division Chair, attempted to mediate the dispute. Moore scheduled meetings for plaintiff and Wells with Loyce Brown, the Chief Equity Officer and head of the Center for Organizational Success at the College. Brown scheduled a series of conflict resolution meetings, attended by Moore, plaintiff, and Wells, from February or March of 2015 through May or June of 2015. Plaintiff persisted in blaming the conflict on Wells. Plaintiff, Wells, Moore, and David Peruski, who was the Dean of Teaching and Learning, began meeting in the fall of 2015 in place of the conflict resolution sessions.

At the beginning of September 2015, plaintiff learned that Wells was seeking tenure and stated his objections to her bid for tenure. Moore, Peruski, Brown, plaintiff, and Wells had a meeting in the middle of September 2015 to discuss how to improve the situation between plaintiff and Wells. The issue of student complaints about Wells's performance arose at this meeting. After the meeting, plaintiff asked Peruski if students could submit their complaints to Peruski, and Peruski agreed. About one week after the meeting, plaintiff notified Moore that he did not intend to offer any EM classes, citing declining enrollment and Wells's failure to notify him about her teaching preferences. Moore disapproved of plaintiff's unilateral decision and instructed him to work it out with Wells.

On October 7, 2015, Wells made her tenure presentation at a division meeting. Plaintiff vocalized his objection to Wells's bid for tenure at the meeting. The next day, Peruski showed Wells the substance of a series of letters he received from one professor and five students, without specific identifying information, complaining about Wells's teaching effectiveness.

From the style of writing and the circumstances described in the complaints, Wells was able to identify all six authors. Peruski confirmed Wells's suppositions about the identities. Peruski then notified plaintiff, Wells, Moore, and Brown that Wells was able to identify the authors of the complaints, Peruski had confirmed them, and one student was uncomfortable that she had been identified. Peruski added that he did not need any more students to contact him. Instead, he sent general surveys out to 543 students, 51 of whom responded, including the students who had sent complaints to Peruski independently. Peruski concluded that the survey responses showed no concerns about Wells's teaching effectiveness.

One month later, on November 10, 2015, plaintiff contacted Jean Goodnow, President of Delta College, to notify her that he believed that a member of the EM faculty had violated FERPA by revealing the identities of the students who had complained. Wells had shared one student's complaint with her husband, who shared it with the pastor of their church, who also knew the student and discussed the complaint with the student. Goodnow instructed plaintiff to contact Margaret Mosqueda, the Vice President of Student and Educational Services, to report the FERPA complaint. Plaintiff and the student separately met with Mosqueda the same day plaintiff contacted Goodnow. Mosqueda later notified plaintiff and the student that the reported complaint was not a FERPA violation, although she was concerned about the apparent disregard for student privacy.

Ten days after this FERPA complaint, on November 20, 2015, Peruski issued personnel memoranda to plaintiff and Wells, warning both plaintiff and Wells to act in a professional and collegial manner. Plaintiff would remain discipline coordinator, but Moore would set plaintiff's and Wells's teaching schedules. Peruski also reassigned Wells to a new office in her preferred location. Around the same time, Crystal McMorris, faculty advisor for the Collegiate, Delta College's student newspaper, saw plaintiff in the Collegiate newsroom, where McMorris and a student agreed faculty did not generally go. After plaintiff left, McMorris asked the students why plaintiff was in the newsroom. One student, Matt Brown, allegedly stated that plaintiff told them that Wells was up for tenure, and they needed to stop it. Another student, Josephine Norris, testified[2] that plaintiff was updating the students about the reported FERPA violation and had mentioned the employment dispute, and that McMorris berated the students for writing letters critical of Wells.

On November 30, 2015, Wells filed a notice of grievance against plaintiff under Delta College Senate Policy 2.012, governing professional integrity, and Senate policies governing equal opportunity and harassment. Wells maintained that plaintiff shared information learned in confidential meetings attended by Wells, plaintiff, Peruski, and Moore and that plaintiff incited students to send complaints about her to Peruski. Wells stated that plaintiff was discussing the confidential meetings with students, referring to McMorris's discussion with students in the Collegiate newsroom. Wells further alleged that plaintiff violated defendant's equal opportunity policy and defendant's prohibition on harassment. This grievance was partially resolved by dissolving the discipline coordinator position formerly held by plaintiff and dividing teaching responsibility equally between Wells and plaintiff as determined by Moore.

---

[2] Unless otherwise indicated, the testimony referred to herein comes from depositions taken in this case or in a federal case filed by Danielle Wright against Delta College under Title IX, 20 USC 1681 (prohibiting discrimination on the basis of sex in any federally-funded "education program or activity"), and the Michigan Civil Rights Act, MCL 37.2101 *et seq*. *Wright v Delta College*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued December 15, 2017 (Case No. 2:16-cv-13908).

Following Peruski's issuance of the November 20, 2015 memoranda, Wells moved into a new office, but not immediately. Plaintiff posted a note for Wells on the door[3] of what appeared to be Wells's old office, instructing Wells that she should not be there until the lock was changed, she should not have access to plaintiff's office, and she should leave. Wells found the note on January 21, 2016.

A letter that was highly critical of Wells, dated January 29, 2016, and signed by a "disillusioned student," was sent to at least one Vice President in the College and possibly to the Board of Trustees. That letter accused Moore of giving Wells preferential treatment by assigning Wells to teach technical courses when Peruski had ordered otherwise and by redesignating certain classes that Wells taught to help Wells "meet the 'contact/hours/load' requirements for" full-time instructors. The letter stated that Wells taught technical skills by telling students to conduct internet searches and watch online tutorials. Wright later admitted that she wrote the letter. Plaintiff denied sharing with Wright information discussed at confidential meetings among plaintiff, Wells, Moore, and Peruski.

On February 12, 2016, Wells filed a second notice of professional integrity claim under Senate Policy 2.012, echoing the allegations brought in the prior claim, alleging that plaintiff breached the confidentiality of meetings with Peruski and Moore, solicited students to slander Wells's name and reputation in service of his dispute with Wells, and colluded with Wright to author the "disillusioned student" letter because it referred to information discussed at the confidential meetings. Wells also invoked Senate Policy 3.021, governing discipline for nonteaching reasons.

Pursuant to Senate Policy 2.012, an ad hoc committee, consisting of one member of support staff, one faculty member, and one administrative professional at the College, began an investigation into Wells's allegations at the end of February 2016. While the ad hoc committee investigated the allegations, Dr. Reva Curry, Vice President of Instruction and Learning Services, issued a formal notice of discipline under Senate Policy 3.021 in response to plaintiff's posting of the aforementioned note, which Curry found to violate the directive that plaintiff behave toward Wells in a professional and collegial manner. Curry suspended plaintiff for one day without pay, and warned him that further discipline, including discharge, would be warranted if plaintiff failed to work collegially with Wells.

Also in the spring of 2016, Chief Robert Battinkoff, Director of Public Safety at the College, conducted an investigation into Wells's discrimination and harassment claims under Title IX, which prohibits discrimination or harassment based on gender. Battinkoff reviewed the student complaints sent to Peruski, the "disillusioned student" letter, Wells's grievance, and other correspondence. He also interviewed Wells, four students, McMorris, Brown, and Wright. In April 2016, Battinkoff produced a report in which he concluded that there was evidence of a personal and professional dispute between plaintiff and Wells, but insufficient evidence of

---

[3] Plaintiff did not deny writing the note, but denied posting it where anyone other than Wells could see it.

gender bias. Battinkoff added that he made no findings related to the Senate Policy violations, which were outside the scope of his investigation.

The ad hoc committee released its report in May 2016. The ad hoc committee had interviewed Moore, Peruski, Brown, President Goodnow, several faculty members and administrators familiar with the dispute or with plaintiff and Wells, two students (Norris and Megan Escamilla), Wells, and plaintiff. During her interview with the committee, Goodnow mentioned plaintiff's concern about a FERPA violation. Goodnow spoke positively about plaintiff, stated her surprise to hear about the conflict because plaintiff had been positive about hiring Wells, and concluded that she had no personal knowledge that led her to believe that plaintiff acted without professional integrity. The committee found the charge that plaintiff solicited students to slander Wells to be substantiated by the statements of multiple witnesses and the results of the surveys finding concerns about Wells's teaching effectiveness to be without merit. The committee found support for the charge of collusion between plaintiff and Wright. The committee also criticized Wells and Peruski for sharing the names of the students who submitted the anonymous complaint, Peruski with Wells and Wells with her husband. The committee recommended termination of plaintiff's employment for just cause under Senate Policy 3.021 because plaintiff had repeatedly demonstrated his unwillingness to work with Wells, the dispute had a negative effect on students, other faculty, and administrators, plaintiff breached confidentiality throughout the process, and plaintiff continued to make unsubstantiated allegations about Wells's competence.

In July 2016, Curry gave plaintiff notice of formal charges, triggering a Section 3.021 due-process proceeding. Curry summarized the charges as "soliciting students to slander a colleague's name and reputation; violating confidentiality; colluding with an adjunct faculty member to slander a colleague's name and reputation; intentionally undermining a colleague and the program, including with students and others; continuing to be unwilling to resolve differences with a colleague; [and] giving false testimony in the course of an investigation and insubordination" in violation of Senate Policy 2.012, governing professional integrity, as well as other Senate Policies. On August 4, 2016, plaintiff attended a Section 3.021 due process proceeding with Curry and Scott Lewless, Director of Human Resources. Curry presented evidence supporting each charge. Plaintiff responded to each charge and asked Curry to review the Title IX investigation, claiming that it would bolster his defense. In a memorandum Curry sent to President Goodnow on August 8, 2016, Curry agreed with the ad hoc committee's recommendation that plaintiff's employment be terminated. Curry noted that some of the students who participated in the Title IX investigation refused to be interviewed by the ad hoc committee. Curry noted Battinkoff's finding of insufficient evidence of gender discrimination, which she took into consideration, but she also noted that the standards governing the investigation were different. Curry placed plaintiff on paid suspension.

Plaintiff appealed Curry's August 8, 2016 recommendation, challenging the completeness of the ad hoc committee's investigation because it did not interview all of the students involved, and labeling the testimony of Wells, Moore, and McMorris false and "unprovable hearsay." An investigative panel consisting of two faculty members and Lewless reviewed the record, including the ad hoc committee report, to ensure the completeness of the record. The panel also interviewed Moore, Brown, Peruski, and Curry, whom the panel found to

be credible. Plaintiff responded to the investigative panel report, reiterating the challenges stated in his prior appeal.

An appeal panel consisting of two deans and three professors held a hearing on October 10, 2016, at which Curry and plaintiff presented their positions. The appeal panel issued its initial recommendation on October 17, 2016, declining to endorse the recommendation of termination of plaintiff's employment because it found two due-process deficiencies, namely, Curry's failure to identify any misconduct following her February 2016 disciplinary action and the investigative panel's failure to interview plaintiff, which might have necessitated a follow-up interview with Wells.[4] The appeal panel also found that the charges that plaintiff solicited students to slander Wells and that plaintiff colluded with Wright to slander Wells were not supported by "indisputable evidence." Had they been substantiated, the appeal panel would have endorsed termination of plaintiff's employment. The appeal found the other charges substantiated, specifically, charges that plaintiff breached the confidentiality of the conflict resolution meetings, was unwilling to resolve his differences with Wells, was insubordinate when he posted the note on the door, and violated various Senate Policies. President Goodnow returned the case to the appeal panel with instructions to interview Wells and Lewless and update its recommendation.

The appeal panel interviewed Wells and Lewless and unanimously revised its recommendation. The appeal panel members all testified that, after interviewing Lewless, they all understood that two grievance procedures were simultaneously underway and that Curry's August 2016 recommendation that plaintiff's employment be terminated related to more behavior than the note posted on the door that led to the February 2016 suspension. The appeal panel amended its findings regarding due process and determined that there were no due-process violations. The appeal panel found the charge that plaintiff solicited students to slander Wells substantiated, basing their decision on the degree of vitriol in the student letters sent to Peruski around the time Wells was seeking tenure, Norris's statement that plaintiff told students about the harassment complaint, and McMorris's statement that Matt Brown told her that plaintiff told the students in the Collegiate newsroom that Wells was up for tenure and they needed to stop it. The panel also found that evidence supported the charge that plaintiff colluded with Wright to slander Wells because the "disillusioned student" letter contained information that only plaintiff would have learned from the confidential memoranda Peruski issued and because the letter used phrases that students would not have known about in referencing a professor's class load. The appeal panel unanimously found support for the charges by a preponderance of the evidence and recommended termination of plaintiff's employment.

President Goodnow decided to terminate plaintiff's employment on November 22, 2016. Goodnow concluded that plaintiff was afforded due process. Goodnow found that plaintiff demonstrated his unwillingness to work toward resolving the conflict with Wells even after he

---

[4] In an amended recommendation, the appeal panel stated that plaintiff's interview by the panel during a due-process hearing, and Wells's subsequent interview by the panel, alleviated any due process concerns.

was directed to, engaged students in a campaign to slander Wells to obstruct her bid for tenure and possibly get her fired, and shared confidential information with students to effectuate that goal. Goodnow added that plaintiff should not have involved students in the dispute. Goodnow concluded that plaintiff gave false information during the investigation when he said he did not know that the conflict resolution sessions were confidential because Brown would have informed plaintiff that they were confidential.

In December 2016, plaintiff filed a complaint in the trial court, alleging a violation of the WPA. Defendant denied the allegation that plaintiff's FERPA complaint was related to the termination of plaintiff's employment. Defendant moved for summary disposition for this reason, and the trial court granted defendant's motion.

## II. ANALYSIS

Plaintiff contends on appeal that the trial court erred by granting defendant's motion for summary disposition of his WPA claim. We disagree.

"This Court reviews de novo a trial court's ruling on a motion for summary disposition." *Anzaldua v Neogen Corp*, 292 Mich App 626, 629; 808 NW2d 804 (2011). "A motion under MCR 2.116(C)(10) tests the factual support for a claim and should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id*. at 630. This Court reviews the evidence "in a light most favorable to the nonmoving party to determine whether a record could be developed that would leave open an issue on which reasonable minds could differ." *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 435; 566 NW2d 661 (1997).

The WPA prohibits discharge, discrimination, or retaliation against an employee "because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a" federal, state, or local law or regulation. MCL 15.362. To establish a prima facie case under the WPA, "a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *West v Gen Motors Corp*, 469 Mich 177, 183-184; 665 NW2d 468 (2003). Summary disposition in favor of the defendant employer is proper when the "plaintiff cannot factually demonstrate a causal link between the protected activity and the adverse employment action." *Id*. at 184. It is undisputed that plaintiff engaged in protected activity when he reported a suspected FERPA violation and that defendant's termination of plaintiff's employment was an adverse employment action. Causation is the only contested issue.

A plaintiff may establish a causal connection through either direct evidence or indirect and circumstantial evidence. *Shaw v Ecorse*, 283 Mich App 1, 14; 770 NW2d 31 (2009). In this case, the trial court determined that plaintiff produced no direct evidence of retaliation, and plaintiff does not argue otherwise on appeal. "To establish causation using circumstantial evidence, the 'circumstantial proof must facilitate reasonable inferences of causation, not mere speculation.' " *Id*. at 14-15, quoting *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994). "Speculation or mere conjecture 'is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference.' " *Shaw*, 283 Mich App at

15, quoting *Skinner*, 445 Mich at 164 (quotation marks and citation omitted). Once a plaintiff presents a prima facie case from which the fact finder could reasonably infer that a causal link exists between the protected activity and the employer's adverse employment action, a rebuttable presumption of retaliation arises. *Debano-Griffin v Lake Co*, 493 Mich 167, 176; 828 NW2d 634 (2013). The employer may rebut this presumption with evidence that a legitimate reason existed for its adverse employment action. Unless the plaintiff shows that "a reasonable fact-finder could still conclude that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action, the employer will be entitled to summary disposition. *Id*.

Plaintiff first argues that he produced sufficient circumstantial evidence of retaliation to survive summary disposition by showing that the timing of defendant's adverse employment action in relation to the protected activity was suspicious. We disagree.

The timing of an adverse employment action occurring after a protected activity, alone, "does not demonstrate a causal connection between the protected activity and any adverse employment action." *West*, 469 Mich at 186. However, timing, combined with other factors, such as differential treatment before and after the protected activity and a supervisor's stated displeasure about the cost resulting from the protected activity, may be sufficient to establish a triable issue of causation. *Henry v Detroit*, 234 Mich App 405, 414; 594 NW2d 107 (1999). Plaintiff isolates three dates to support his argument that the timing was suspicious: (1) November 10, 2015, the date of the protected activity, (2) November 20, 2015, the date Peruski placed a personnel memorandum in plaintiff's file, and (3) November 30, 2015, the date Wells filed her first complaint against plaintiff, which culminated in the termination of plaintiff's employment. Plaintiff implies that the suspicious timing of the latter two events suggests that they were responses to his having reported a potential FERPA violation. In our view, plaintiff's implication of a causal link is mere speculation, an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference." *Shaw*, 283 Mich App at 15 (quotation marks and citation omitted).

Record evidence establishes that the memorandum Peruski placed in plaintiff's file on November 20, 2015, admonishing plaintiff to act in a collegial and professional manner, was the culmination of largely unsuccessful attempts to resolve the conflict between plaintiff and Wells. Peruski placed a similar memorandum, with an identical admonishment, in Wells's file. Although Peruski placed the memorandum in plaintiff's file after plaintiff reported the potential FERPA violation, Peruski testified in an affidavit that he was unaware of plaintiff's protected activity when he issued the memorandum, and plaintiff presents no evidence beyond the timing of Peruski's action that the memorandum was in any way related to his protected activity. Given the broader context giving rise to the memorandum, the content of the memorandum, and the fact that Peruski put a similar memorandum in Wells's file, the mere fact that Peruski placed it in plaintiff's file after he reported a potential FERPA violation does not support a reasonable inference that Peruski's action was related to the protected activity. See *Shaw*, 283 Mich App at 14-15.

Likewise, record evidence indicates that Wells's November 30, 2015 professional integrity claim against plaintiff arose solely from her perception of plaintiff's conduct during their ongoing professional feud. Assuming for the sake of argument that Wells's claim is an "adverse employment action" by defendant, plaintiff presents absolutely no evidence that would

support a reasonable inference that Wells knew that plaintiff had reported a potential FERPA violation when she filed her claim or that her claim was in any way related to plaintiff's protected activity. See *id.*; *Debano-Griffin*, 493 Mich at 176.

Plaintiff also argues that President Goodnow's involvement in the disciplinary process demonstrates a causal link between his protected activity and defendant's eventual termination of his employment. Plaintiff insinuates a causal link by observing that he reported the potential FERPA violation to Goodnow, Goodnow "inserted" the protected activity into her interview with the ad hoc committee investigating Wells's professional integrity complaint against plaintiff, and Goodnow rejected the appeal panel's first recommendation.

A review of the ad hoc committee's report does not give rise to a reasonable inference that Goodnow's mention of the potential FERPA violation in her interview with the committee reflects retaliatory intent. It is unclear from the ad hoc committee's report what question prompted Goodnow's brief mention of the potential FERPA violation, or what exactly she said.[5] The ad hoc committee's recommendation reports that Goodnow had been kept informed of the ongoing conflict between plaintiff and Wells and of the attempts at resolution. The committee said Goodnow was "aware of an incident in which a student complained to the DTL [Dean of Teaching and Learning, Peruski], the Instructor [Wells] figured out who it was, and the student's pastor became involved." Several bullet points later, the committee records, "[plaintiff] was concerned about a FERPA violation." Goodnow's knowledge of plaintiff's concern about a FERPA violation is unremarkable, given that plaintiff had reported a potential violation to her. Nor can one reasonably deduce any "displeasure about the cost resulting from the protected activity," *Henry*, 234 Mich App at 414, or retaliatory intent from the ad hoc committee's brief factual statement about plaintiff's concern. See *Shaw*, 283 Mich App at 15.

In sum, the circumstantial evidence plaintiff proffers to establish causation—Peruski's memorandum, Wells's professional integrity complaint, and Goodnow's indication that plaintiff was concerned about a FERPA violation—do not "facilitate reasonable inferences of causation." *Shaw*, 283 Mich App at 14-15 (quotation marks and citation omitted). The mere fact that these events occurred after plaintiff reported a potential FERPA violation does not demonstrate a causal connection between the protected activity and defendant's eventual termination of plaintiff's employment. *West*, 469 Mich at 186. The record clearly establishes that there is nothing "suspicious" about the evidence proffered by plaintiff as demonstrative of causation. Moreover, plaintiff points to no evidence indicating that defendant treated him differently after he reported the potential FERPA violation. See *Henry*, 234 Mich App at 414. To the contrary, plaintiff's proffered evidence arises indisputably from the unresolved conflict between plaintiff and Wells; considered in the context of the whole record, plaintiff's report of the FERPA

---

[5] The recommendation summarizes the substance of each witness's interview in bullet-pointed declaratory sentences appearing under the witness's name. So, for example, the first bullet point under President Goodnow's name states: "Dr. Goodnow thought she was receiving an update, not being interviewed."

violation appears as a minor incident[6] in the otherwise ongoing professional dispute. Accordingly, plaintiff has not established a prima facie case for retaliation based on the timing of these various events. See *West*, 469 Mich at 186.

Plaintiff next argues that defendant's failure to follow its internal policies provides sufficient circumstantial evidence of causation. We disagree.

Plaintiff first asserts that the investigative panel failed in its responsibility to investigate and to make credibility determinations. Pursuant to Senate Policy 3.021(IV)(B), the investigative panel is "a fact gathering body who will develop a record to be reviewed by the [a]ppeal [p]anel." The investigative panel has the authority, among other things, to "[r]eview all written information and documentation relied upon to support the charge(s)," "to interview witnesses and take written or electronically recorded witness statements," and to "receive non-privileged College records" that the panel considers relevant. Senate Policy 3.021(IV)(B)(2)-(4). Plaintiff contends that the investigative panel should have considered the student testimony from Battinkoff's Title IX investigation. Had it done so, it would have realized that the ad hoc committee mischaracterized Escamilla's testimony, and that Matt Brown's testimony in the Title IX investigation contradicted what the ad hoc committee reported of McMorris's interview. We find plaintiff's argument unpersuasive.

The scope and purpose of the Title IX investigation differed from that of defendant's personnel investigations, and Battinkoff explicitly declined to make any findings regarding the personnel dispute between Wells and plaintiff.[7] In addition, both the ad hoc committee and the investigative panel considered testimony only from individuals who appeared before them. Plaintiff asserts in his brief to this Court that the failure to consider the Title IX investigation, by which he means primarily the record of the student testimony, despite his repeated requests that it be considered, "raises a question about the reasonableness of the investigation." We disagree. Senate Policy 3.021(IV)(B)(6) required the investigative panel to "[m]ake determinations concerning credibility of any witnesses." The credibility of a witness "is determined by more than words and includes tonal quality, volume, speech patterns, and demeanor," all of which provide clues regarding whether a witness is telling the truth. *People v Lemon*, 456 Mich 625, 645; 576 NW2d 129 (1998); see also *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 491; 668 NW2d 402 (2003) (recognizing the unique opportunity of those observing witnesses to assess their credibility). Thus, it appears to us eminently reasonable that the panel would want to

---

[6] This is not to say that a potential FERPA violation is minor or that defendant discounted the possibility of a FERPA violation. As indicated above, although the reported complaint was not a FERPA violation, Mosqueda was concerned nevertheless about the apparent disregard for student privacy, and the ad hoc committee found that Peruski did not act with sufficient professional integrity to protect the anonymity of the students and faculty member who sent him letters critical of Wells. A disciplinary letter to that effect was placed in Peruski's file.

[7] Curry did consider Battinkoff's conclusion that there was insufficient evidence of gender bias when she made her August 2016 recommendation to terminate plaintiff's employment.

base its credibility determination on the testimony of witnesses who appeared before it and subjected themselves to its questioning rather than on hearsay student testimony.

Furthermore, the record suggests that the ad hoc committee did try to interview the students whom Battinkoff interviewed. According to Lewless, the ad hoc committee attempted to contact all of the students who had e-mailed Peruski, which included students interviewed for the Title IX investigation. However, Lewless reported that, other than the two students that the ad hoc committee interviewed, "no additional students were willing to come forward and make a statement." Plaintiff points to no provision in the Senate Policy giving the ad hoc committee or the investigative panel authority to compel persons to submit to an interview. Moreover, had plaintiff wanted the ad hoc committee or investigative panel to consider the testimony of particular students, he had the opportunity to have them appear on his behalf as witnesses at the due process proceeding. However, he did not, explaining at his deposition that he decided to attend the proceeding alone when he had trouble getting students to go with him because of "their summer schedules." In sum, given the investigative panel's responsibility for making credibility determinations, and its lack of authority to compel witnesses to subject themselves to an interview, it does not seem unreasonable to us that the panel would decline to consider testimony from witnesses unwilling to appear before it, nor does it invalidate the panel's investigation.

Plaintiff's next contention, that the investigative panel did not make credibility determinations, is belied by the panel's report, which specifically states that it found the witnesses it interviewed credible. The fact that the panel's credibility determinations do not comport with plaintiff's does not mean that the panel did not fulfill its responsibilities under senate policy.

Plaintiff next asserts that the appeal panel violated his right to due process by not interviewing him after it interviewed Wells, who, plaintiff asserts, brought forth new allegations during her interview. However, investigative panel member Jonathan Miller testified that Wells did not raise new allegations in her interview, and plaintiff provides no evidence to the contrary. "An appellant may not merely announce a position and leave it to this Court to discover and rationalize the basis for the claims. *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 650; 662 NW2d 424 (2003). Accordingly, we find no merit in plaintiff's assertion that the investigative panel violated his right to due process by not re-interviewing him after its interview of Wells.

Finally, plaintiff argues that defendant violated its internal policies by not following progressive discipline and by punishing him twice for the same conduct. As already indicated, however, Lewless's interview by the appeal panel clarified that the investigation triggered by Wells's professional integrity complaint and resulting in the termination of plaintiff's employment was separate and distinct from Curry's February 19, 2016 letter. Plaintiff's general inability to interact with Wells in a professional and collegial manner may have given rise to Curry's letter as well as to the Senate Policy 3.021 proceeding that resulted in his suspension and eventual termination, but the proceedings addressed different specific behaviors. The appeal panel made this clear in their amended recommendation.

The record also indicates that after plaintiff resisted the efforts of the administration to resolve the professional dispute between him and Wells, Peruski placed a memoranda in plaintiff's and Wells's file directing both of them to behave professionally and collegially toward one another. After plaintiff's conduct violated the terms of that memorandum, a conclusion that plaintiff did not appeal, Curry imposed a one-day suspension without pay and issued a disciplinary letter informing plaintiff, among other things, that "further acts of insubordination or any other misconduct on your part will result in additional discipline up to and including discharge." As already indicated, the appeal panel initially recommended a remedial penalty short of termination plaintiff's employment. However, after it understood that the one-day suspension and disciplinary letter imposed by Curry in February 2016 were for actions separate and distinct from those currently under investigation, it unanimously concluded that Curry did not violate the spirit of progressive discipline and that its findings warranted termination of plaintiff's employment. We see no error in defendant's proceedings or findings.

Because plaintiff has failed to establish a prima facie case from which a fact finder could reasonably infer that a causal link exits between plaintiff's report of a potential FERPA violation and defendant's eventual termination of plaintiff's employment, no presumption of retaliation arises. *Debano-Griffin*, 493 Mich at 176. Therefore, we need not consider plaintiff's argument that defendant's legitimate, non-retaliatory reasons for its adverse employment action were mere pretexts. Further, even if we were to consider plaintiff's argument, we would find it lacking.

Defendant provided several legitimate reasons for its termination decision. Goodnow stated that plaintiff refused to work with Wells "in a collegial manner and made it [his] focus to have Kim Wells denied tenure and/or be fired[,]" and noted that plaintiff was suspended for this reason. She further found that plaintiff "engage[d] students in a campaign against Kim Wells in an attempt to slander her name and reputation and in an attempt to deny her tenure and/or be fired," "shared confidential information with students in pursuit of [his] goals," which constituted "an abuse of [plaintiff's] authority and relationship with the students," and "gave false information during the course of an investigation."

Plaintiff contends that these reasons are pretextual. He argues that the ad hoc committee mischaracterized Escamilla's interview testimony and criticizes Curry and the investigative panel for refusing to include student testimony from the Title IX investigation. Plaintiff contends that the latter would have provided evidence that (1) the ad hoc committee mischaracterized Escamilla's statements, (2) Matt Brown denied McMorris's statement attributed to him in the ad hoc committee report, and (3) plaintiff was only following Peruski's instructions that plaintiff could ask students to submit complaints about the program to Peruski.

Plaintiff's argument about the students' statements in various investigations, the exact words they used, and what they did not did not say misses the greater point, which is that a preponderance of the evidence showed that plaintiff improperly involved students in his dispute with Wells. By sharing with students his opinion of Wells, his opposition to her bid for tenure, and the status of her grievance against him, and by "updating" on the potential FERPA violation, plaintiff created an environment that encouraged certain students to take sides in the dispute. Although Peruski told plaintiff that students could e-mail letters of complaint about the program directly to him, this arrangement arose after a meeting at which the issue of Wells's teaching effectiveness arose and shortly after plaintiff learned that Wells was up for tenure. Plaintiff

conveyed information of this opportunity through his assistant, and Norris told the ad hoc committee that she thought plaintiff's assistant conveyed the information to her because she had complained about Wells in the past. The resulting letters focused exclusively and in considerable detail on Wells's alleged inadequacies. Plaintiff places credence in the initial recommendation of the appeal panel, and even there, the panel found there was "evidence that [plaintiff] did ask students critical of Ms. Wells to write letter to Dean Peruski, however, there is no evidence that [plaintiff] told students what to write."

Plaintiff's focus on what students said regarding the letters and Wells's bid for tenure overlooks that appeal panel's ultimate conclusion that a preponderance of the evidence established that plaintiff violated the confidentiality of the conflict resolution meetings, was unwilling to resolve his dispute with Wells, was insubordinate, gave false testimony during the course of an investigation, and violated Delta College Senate policies prohibiting harassment. Plaintiff has raised no factual challenges to these substantiated findings. In sum, even if we accept plaintiff's position regarding which students said what, he has identified no evidence creating a genuine issue of material fact regarding whether defendant's reasons for terminating his employment were pretextual.

We affirm.

/s/ Douglas B. Shapiro
/s/ Stephen L. Borrello
/s/ Jane M. Beckering

-13-